[Crim. No. 34638. Second Dist., Div. Five. May 13, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
RAMONA ESTELLE BROWN et al., Defendants and Appellants.

COUNSEL

Herbert F. Blanck and Norman W. de Carteret, under appointments by the Court of Appeal, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUS, P. J.—Codefendants and appellants James Donald McGinnis (McGinnis) and Ramona Brown (Brown) were charged with the murder of Raymond Brown (Ray), Ramona's estranged husband. It was also alleged that a principal in the offense was armed with a rifle within the meaning of Penal Code section 12022, subdivision (a) and personally used the rifle within the meaning of Penal Code section 12022.5 and 1203.06, subdivision (a)(1). The defendants each pleaded not guilty. Brown's section 995 motion was denied. Each of the defendants' motions under Evidence Code section 402 and Penal Code section 1538.5 was denied. Brown's motion for severance was granted.

Separate jury trials for each of the defendants were held. At the end of Brown's trial, the jury declared itself to be hopelessly deadlocked and the court declared a mistrial. Thereafter, Brown withdrew her plea of not guilty and entered a new plea of guilty of second degree murder. She also admitted the armed allegation. Probation was denied and Brown was sentenced to the upper term, seven years, with an additional year for the armed allegation which was ordered to run consecutively to the seven-year term.

McGinnis' jury trial resulted in a verdict of guilty of first degree murder and a finding that the armed and use allegations were true. McGinnis was sentenced to state prison for life.

Both defendants have filed notices of appeal from the judgment. Brown did not apply for or secure a certificate of probable cause as provided for in Penal Code section 1237.5.

Facts

As noted, the murder victim was the estranged husband of Brown. McGinnis was Brown's boyfriend. Brown and Ray had separated in about August or September 1977. McGinnis, who was separated from his own wife, moved into the Browns' trailer home in Bloomington, California near San Bernardino with Brown and her three children by Ray. McGinnis was in the United States Air Force and was employed as a mechanic at Edwards Air Force Base. Ray was employed at the Veteran's Administration Medical Center (V.A.) in Sepulveda and lived in an apartment on Laurel Canyon Boulevard in North Hollywood.

There was evidence of some animosity among the principals. Brown's mother, Adelheid M. Logan, testified that Ray beat Brown and their children and that Brown told her Ray had molested the children around January 1, 1978. Stephen Forsythe, a friend of McGinnis and the Browns testified that McGinnis told him to give Ray "a warning" on three or four different occasions. He testified, "[a]t one time he told me to tell Ray to stay away from the boys [meaning Ray's three boys]. That if he ever came around there—he said something like—I can't quote him exactly—it was like, 'Blow his head off,' or something like that."

At the end of January, about two weeks before the shooting of Ray, Lupe Smith, the manager of the apartment where the victim lived, saw a "girl" and a man looking in the apartment house mailboxes. She asked them if they needed help and the girl said she was looking for Charlie Brown. Charlie Brown was Ray's nickname. The girl asked Mrs. Smith where Charlie's car was parked. Mrs. Smith said that Charlie Brown was in apartment five and that the girl would have to ask him where he parked his car. The girl told Mrs. Smith that she was Charlie Brown's wife. The girl resembled Brown "in the face."

On Sunday, February 12, the day before the homicide, defendants were at Brown's mother's house in Sepulveda. At about 10:30 a.m. they drove to the Veteran's Administration Medical Center where Ray worked. Brown asked Ray if she could borrow $10. Ray gave her the money and she said "Thank you, Ray. I'll pay you back Wednesday."

The defendants returned to Brown's mother's house where they remained until about 2 in the afternoon. At that time Ray came over to talk to Brown "about alimony." Ray told Brown "I cannot give you

more. Only this much. And I will leave it with your mother every two weeks."

Shortly after Ray left Brown's mother's house, Brown, McGinnis and the three children also left. They drove in their pickup truck with a camper on the back to McGinnis' mother's house in Rosamond, California for a birthday party. They left Rosamond at about 9 that evening. McGinnis' mother believed they were going home to their house trailer in Bloomington.

McGinnis telephoned Edwards Air Force base at about 9 p.m. on February 12 and said he would be late for work on Monday if the weather was bad and if Highway 138 was closed. McGinnis normally got to work at 7 in the morning.

Ray was shot to death with a high powered rifle at about 6 in the morning on Monday, February 13, 1978. His body was found at about 11 a.m. that day lying between his car and another in the parking garage at his apartment house.

McGinnis was late to work on the morning of February 13. He arrived between 8:10 and 8:20 a.m.

Brown and McGinnis had their first contact with the police in the evening of February 13 at the home of Brown's mother in Sepulveda. McGinnis confessed to shooting Ray on February 15.[1] Brown confessed to complicity in the murder on the same day.

Through his job at the V.A. Ray had had life insurance coverage of $25,000. The policy provided for double indemnity in case of death by accident or homicide. Brown was the beneficiary. Further, as a survivor annuitant, Brown would be entitled to about $175 per month until she remarried and her children collectively would be entitled to a total of $129 a month until they were 18,[2] or if they went to college, until they were 22.

On March 8, Brown and her mother went to the V.A. where Ray had been employed to drop off a death certificate and fill out applications

---

[1] Since McGinnis has challenged the admissibility of his confession we shall recite the facts leading up to the confession in connection with our discussion of that issue.

[2] The three boys were aged two, four and six.

for his insurance and death benefits.[3] They had been contacted by the V.A. and asked to bring in Ray's keys and uniforms. It was the V.A.'s standard procedure to require the death certificate and to have the forms filled out.

## DISCUSSION

### I.

#### BROWN'S APPEAL

As noted previously, following a mistrial, Brown pleaded guilty to one count of second degree murder. The only issues raised on her appeal are claims that her tape-recorded confessions were involuntary and obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974]. These issues were raised in the trial court by way of a pretrial motion which her counsel designated as being made pursuant to Penal Code section 1538.5. He claimed that "tangible evidence"—the tape-recorded statements—was "obtained as the result of an illegal search of her mental process."

■ The present attempt to raise these issues on appeal is presumably made on the authority of Penal Code section 1538.5, subdivision (m). Absent such authority, it is clear that such issues cannot be raised on an appeal following a guilty plea. (*People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896 [135 Cal.Rptr. 786, 558 P.2d 872].)[4]

It is clear, however, that the motion below was nothing more than a motion to suppress Brown's confession, based upon Fifth Amendment grounds, dressed up as a section 1538.5 motion. Section 1538.5 "can be properly employed only to shield a defendant from Fourth Amendment violations; it has no part in protecting against Fifth Amendment infringements. . . ." (*People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 734 [125 Cal.Rptr. 798, 542 P.2d 1390].) No claim was ever made that any tangible evidence—aside from the tapes themselves, which were simply a memorialization of the statements—was obtained as a re-

---

[3]Presumably, Brown had been released on bail.

[4]There is no evidence in this record, as there was in *People* v. *DeVaughn, supra*, 18 Cal.3d 889, that the guilty plea was improperly induced by a promise by the trial court that the issues could be raised on appeal.

sult of the statements. (Cf., *People* v. *Superior Court* (*Mahle*) (1970) 3 Cal.App.3d 476, 484 [83 Cal.Rptr. 771].) The issues raised by Brown are not cognizable on appeal and the appeal must be dismissed.

## II.

### McGinnis' Appeal

#### A.

*Admissibility of McGinnis' Confession*

At about 9:30 p.m. on February 13, Officers Quagliana and Jackson first talked with defendant McGinnis at Brown's mother's house in Sepulveda. The police knew that McGinnis was Brown's boyfriend and that Brown was the victim's estranged wife. However, at that time McGinnis was not a suspect in the case and McGinnis was not given the *Miranda* warnings. Officer Quagliana asked if he might search McGinnis' vehicle and McGinnis gave his consent. Before the search McGinnis told Officer Quagliana that there were some guns in it. The search revealed a .22 caliber rifle and a .45 caliber handgun.

The police asked McGinnis to return with them to the North Hollywood police station. McGinnis and Brown were transported to the police station in separate police vehicles. They arrived at the station at about 10:30 p.m. McGinnis was taken to an interrogation room. At this point McGinnis was Mirandized. He indicated that he understood his rights and that he wished to discuss the matter with the police. The ensuing interview commenced at 11 p.m. and lasted for about 45 minutes to an hour. McGinnis made no incriminating statements. He did, however, make contradictory statements concerning the time and place he had last seen the victim. These contradictory statements led the police to believe that further investigation was necessary.

McGinnis agreed to take a polygraph examination on the next day. He and Brown were returned to Brown's mother's house by the police.

At about 10 a.m. on February 14, McGinnis and Ramona went to the North Hollywood police station. They were transported to the Van Nuys station where the polygraph examination was administered by Los Angeles Polygraph Examiner Burt Cain. Before testing McGinnis, Cain asked him whether he had been advised and whether he understood his

"rights." McGinnis said, "Yes." At the end of the test Cain told McGinnis that he had not passed the test and that "he was deceptive."

Cain then told Officer Jackson that "McGinnis showed very much guilty knowledge in the area of the crime and especially the weapon." Sergeant Gastaldo was with Officer Jackson at the Van Nuys station. At approximately 6 p.m., after the test was concluded, Gastaldo met McGinnis in the hallway and told him "that the polygraph examination did not turn out too well as far as he was concerned and that I would like to go back to North Hollywood station and discuss the case with him."

McGinnis was transported back to the North Hollywood station. The next interview occurred at about 7:30 p.m. on February 14 in Officer Jackson's office at the North Hollywood station. This interview, which lasted about 25 to 30 minutes, was tape recorded. Sergeant Gastaldo was also present. McGinnis was again Mirandized. During this interview McGinnis said he had not shot Ray Brown but that he had driven the car for one Larry Cook and that Larry Cook had done the shooting.[5] After McGinnis made this statement he was arrested and placed in custody.

His next conversation with the police occurred the following day at 6 p.m. in Officer Jackson's office. This conversation was not tape recorded. Officer Gastaldo told McGinnis that Larry Cook did not kill Ray and indicated that he thought McGinnis had falsely accused Cook. McGinnis stated that he thought he needed an attorney and did not want to talk to the officers any further. McGinnis was immediately returned to jail. It was then about 6:30 p.m.

At approximately 8:15 that same night, McGinnis requested that he be allowed to talk to Investigator Jackson. Jackson and Gastaldo were notified and McGinnis was brought to Jackson's office. The entire conversation was recorded. During this interview McGinnis admitted that he shot Ray.

McGinnis argues that he did not voluntarily take the polygraph test. In essence his argument is that the police by merely asking a suspect to take a lie detector test coerce an affirmative response. The evidence

---

[5]Larry Cook was also in the Air Force, stationed at Edwards Air Force Base and was a friend of McGinnis and the Browns.

supports a finding that McGinnis voluntarily submitted to the polygraph examination. Officer Quagliana testified that he discussed the test with McGinnis and that McGinnis appeared to be "definitely willing" to take the test. McGinnis agreed to arrange to take some time off from work so that he could take the test the next day. Guagliano testified that the police would have let McGinnis leave the police station that night even if he had refused to take the test. The evidence does not support McGinnis' contention that the agreement to take the test was submission to an implied assertion of authority by the police.

■ McGinnis contends that "the polygraph test was a threat and inducement." He points to the statements of the polygraph examiner and the officers indicating that he failed the exam and argues, "All of the statements of the officers added up to inducements and implied threats and were coercive." The evidence does not reveal any threats or promises made to McGinnis in order to secure his confession. "Where the evidence shows that before he confessed the defendant took a lie detector test, if it was taken willingly, neither the fact it was given nor the fact that the defendant was told by the test giver it revealed in his opinion that defendant was not telling the truth, inherently demonstrates coercion. [Citation]." (*People* v. *Barreto* (1967) 256 Cal.App.2d 392, 408 [64 Cal.Rptr. 211]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 431-433 [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Carter* (1970) 7 Cal.App.3d 332, 337 [88 Cal.Rptr. 546] [overruled on other grounds in *People* v. *Beagle* (1972) 6 Cal.3d 441, 452 [99 Cal.Rptr. 313, 492 P.2d 1]]; Annot. (1979) 89 A.L.R.3d 230.)

McGinnis claims he was denied his right to counsel. This is so, he argues, because when, on February 15, he made the statement that he thought he needed a lawyer and that he didn't want to speak to the police anymore, he was taken back to jail immediately rather than to a phone so that he could contact a lawyer. Thereafter, although he initiated the next conversation with the police during which he confessed, McGinnis claims that his action was the result of "trickery" because having asked for an attorney one was not furnished for him.

■ The police were not required to supply defendant with instant representation, but only to stop asking questions until he was represented. After a suspect has been Mirandized, police interrogation must cease if the suspect indicates that he wants an attorney. (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 722-723]; *People* v. *Pettingill* (1978) 21 Cal.3d 231, 238 [145 Cal.Rptr. 861, 578 P.2d

108].) This requirement was complied with in this case. The police initiated no further attempt to interrogate McGinnis. "Statements volunteered when not in response to an interrogation are admissible against a defendant, even after an initial assertion of the right to remain silent. [Citations.] The issue is thus whether the statement was volunteered or was the product of police interrogation...." (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 172 [127 Cal.Rptr. 467, 545 P.2d 843]; *People* v. *Randall* (1970) 1 Cal.3d 948, 956, fn. 7 [83 Cal.Rptr. 658, 464 P.2d 114].) The transcript[6] of the second police interview on February 15 commences as follows: "G. [Officer Gastaldo] O.K., Jim [McGinnis] we were just told by, uh, the messenger that you wanted to talk to us. Is that right? M. [McGinnis] Yes. G. You do want to talk to us. O.K., and that's with, uh, knowing your rights that you've, uh, given up; that you, uh, give up your right to remain silent and talk to us here and now without an attorney. You understand all of that? M. Uh-huh. G. O.K. Be my guest. M. Uh, I did actually do it." There was evidence from which the trial court could have concluded beyond a reasonable doubt that McGinnis' statement was volunteered and was not made in response to interrogation by the police at a time after he had asserted his right to remain silent.

At the hearing on McGinnis' motion to exclude his confession McGinnis testified that after the first interview on February 15, and after he had been returned to his cell, he saw Larry Cook in the jail holding cell. He testified that Larry Cook spoke to him and "said if I did not take the charges off of him that me and my family would be killed." McGinnis testified that his confession was not given voluntarily because "If I had not have done it my family and kids could possibly have been killed."

McGinnis does not raise any issue on this appeal respecting the effect upon the admissibility of his confession of the alleged threat by Larry Cook. However, we think the subject merits some discussion.

In *People* v. *Berve* (1958) 51 Cal.2d 286 [332 P.2d 97], the defendant was severely beaten by the vengeful relatives of the victim and repeatedly told during the course of the beatings that he and his family would be killed if defendant did not confess. The police rescued defen-

---

[6]With the concurrence of counsel for all the parties on appeal, this court caused a transcript of the tape recording of the second McGinnis interview on February 15 to be prepared.

dant from his attackers, and defendant confessed to the police shortly thereafter. The court ruled that the confession was involuntary, stating that the coercive effects of the recent beatings and threats affected the later confession. Thus, it is not necessarily determinative that the alleged coercive force was the product of a third person and not the police. All that is important is the question whether the confession was the product of a rational intellect and free will. (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274]; *People* v. *Haydel* (1974) 12 Cal.3d 190, 197 [115 Cal.Rptr. 394, 524 P.2d 866].)

In determining the voluntariness of a confession, an appellate court must make an independent examination of the record. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) In this examination the court considers the uncontradicted facts and, with respect to conflicting evidence, the trial court's findings unless they are "palpably erroneous." (*People* v. *Watson* (1977) 75 Cal.App.3d 384, 396 [142 Cal.Rptr. 134]; see generally *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-573 [75 Cal.Rptr. 642, 451 P.2d 74].)

The uncontradicted or uncontested facts which must be reviewed independently by this court include "so much of the evidence for the defense as, fairly read in the context of the record as whole, remains uncontradicted." *Culombe* v. *Connecticut* (1961) 367 U.S. 568, 604 [6 L.Ed.2d 1037, 1058, 81 S.Ct. 1860].)

The record in this case poses two problems with respect to McGinnis' testimony that Cook's threats coerced him into confessing. First: must we consider such testimony "uncontradicted" if it was not disputed at the hearing to suppress the confession—the so-called 402 hearing—but was contradicted later at the trial? Second: assuming that we may not consider the later trial testimony, must we accept not only defendant's testimony that he was threatened, but—on this record—also his further assertion that the threat coerced him into confessing?

The first problem arises because the prosecution, for reasons unknown to us, did not produce Cook as a witness at the 402 hearing. Later, during the trial, Cook did testify and categorically denied having threatened McGinnis—in fact he asserted that he never even saw McGinnis at the jail until he, Cook, had already been released. At the 402 hearing, the trial court found that defendant's confession was voluntary without even having heard Cook. It is fair to assume that it

would not have found otherwise, had it had the benefit of Cook's version of the facts.

Although there is precedent for considering facts not before the court at the motion to suppress for the purpose of holding a confession to be involuntary—e.g., *Culombe* v. *Connecticut, supra*, at page 606, footnote 57 [6 L.Ed.2d at page 1060]; *People* v. *Terry* (1974) 38 Cal,App.3d 432, 440-443 [113 Cal.Rptr. 233]—we hesitate to hold that the rule is a two-way street. (Cf., *People* v. *Belton* (1979) 23 Cal.3d 516, 526-527 [153 Cal.Rptr. 195, 591 P.2d 485] [erroneous denial of motion to dismiss under § 1118 of the Pen. Code not saved by later production of essential evidence].) We therefore turn to the second issue: must we accept McGinnis' assertion that the threat coerced him into confessing?

In *Culombe* v. *Connecticut, supra*, the Supreme Court teaches that our inquiry is a "three-phased process. First, there is the business of finding the crude historical facts, the external, 'phenomenological' occurrences and events surrounding the confession. Second, because the concept of 'voluntariness' is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, 'psychological' fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances." (*Id.*, p. 603 [6 L.Ed.2d p. 1058].)

■ McGinnis' testimony that he was threatened was an uncontradicted "crude historical fact." We assume that we are bound to accept it as such. Does this mean, however, that we are also bound to accept it as a "psychological" fact that the threat prevented the confession from being a product of McGinnis' free will? The answer is "no." McGinnis' testimony regarding Larry Cook's threat and its coercive effect loses much of its persuasive force when viewed in the light of the officers' and McGinnis' own testimony that the officers had just told McGinnis that they believed that Larry Cook had not killed Ray and that McGinnis had falsely accused Cook. Under these circumstances the psychological fact—the effect of the threat on McGinnis, is contradicted by other circumstances before the court. Why confess to murder just to clear a person whom the police no longer suspect? It seems inescapable that McGinnis' claim of coercion based on Cook's threat was a sham. The trial court's finding that the voluntariness of the confession was proved beyond a reasonable doubt was correct.

## B.

*The Findings Under Penal Code Sections 12022, Subdivision (a) and 12022.5*

■ McGinnis claims that the armed and use findings under Penal Code sections 12022, subdivision (a) and 12022.5 should be stricken from this judgment because the added penalties provided by these sections may not be imposed when a defendant has been given a life sentence. (*People* v. *Walker* (1976) 18 Cal.3d 232, 243-244 [133 Cal.Rptr. 520, 555 P.2d 306].)

While McGinnis' judgment recites that the use and armed allegations were found to be true, the only punishment imposed is the life sentence. The trial court stated that it wished the judgment to reflect the findings under Penal Code sections 12022, subdivision (a) and 12022.5 "for the purposes of the record and of the community release board in reviewing the totality of your record," but no extra punishment based on those findings was imposed.

## C.

*Prosecutorial Misconduct*

McGinnis claims that the prosecutor made several attempts to introduce hearsay statements of his codefendant Brown. The record does not support this contention.

■ McGinnis points first to the following remarks by the prosecutor during his opening statement: "The evidence will show, ladies and gentlemen, that Mr. Brown was murdered by Mr. McGinnis at the encouragement and, if you will, insistence of Ramona Brown. Sometimes that's referred to as murder for hire, although in this sense there will be no evidence to show that Mr. McGinnis got something financially."[7] Counsel for McGinnis moved for a mistrial out of the presence of the jury claiming that the prosecutor was "going into hearsay." The trial court denied the motion, but readmonished the jury that the lawyers' statements were not evidence.

---

[7] The evidence at trial showed that Brown was waiting for McGinnis in the car while he shot Ray. There was also evidence that McGinnis and Brown intended to be married after Ray's murder.

No specific statements of Brown's were referred to by the prosecutor. Misstatements in an opening statement are usually harmless where the court instructs the jury that statements by counsel cannot be considered as evidence. (*People* v. *Cooper* (1979) 95 Cal.App.3d 844, 849 [157 Cal.Rptr. 348].)

McGinnis also complains about the introduction of a wedding invitation to a wedding scheduled for himself and Brown on April 1, 1978. The invitation contained no hearsay statement by Brown—certainly none that violates section 1250 of the Evidence Code.

McGinnis objected to the testimony of Margaret Mardis, the custodian of records for the Sepulveda V.A. facility where the victim was employed. McGinnis claims that her testimony that Brown and her mother came to the facility, inquired about insurance benefits, and filled out the necessary forms, constituted hearsay. Obviously the testimony disclosed, at most, what in the law of evidence is known as "verbal acts."

McGinnis points to the prosecutor's cross-examination of him after he took the stand in his own defense. McGinnis had testified that he had nothing to do with the shooting of Ray, that he lied when he confessed and that he lied when he implicated Larry Cook. On cross-examination the following occurred: "Q. [Prosecutor] Isn't it fair to state, Mr. McGinnis, that you and Ramona got together and decided to in effect take the heat off yourselves by implicating Larry Cook? A. No ... Q. All of a sudden on the 14th, after being advised of your rights by Jackson on the tape, you implicate Mr. Cook? A. Yes. Q. And the very same statement that you made about Mr. Cook Ramona made, correct? A. A similar statement." McGinnis' counsel objected and moved for a mistrial again on the ground that the prosecution was making references to hearsay statements of Brown. The trial court denied the motion because, while there may have been a reference to such a statement, it was not incriminatory as to McGinnis.

The reference to Brown's statement was not hearsay. Clearly it was not offered to prove the truth of the matter asserted—that Larry Cook killed Ray Brown. (*People* v. *Reyes* (1976) 62 Cal.App.3d 53, 67 [132 Cal.Rptr. 848].) The prosecution merely established that at one point during the investigation, McGinnis and Brown told identical lies. This tended to prove a conspiracy to cover up incriminating facts.

■ In the course of his opening argument the prosecutor said "Of course, I believe the People have proved way beyond a reasonable doubt what is necessary beyond a reasonable doubt to show you that Mr. McGinnis did it." McGinnis claims this was misconduct because the prosecutor expressed a personal belief in McGinnis' guilt. Actually, he expressed a personal belief in the state of the evidence. A prosecutor may express his opinion of a defendant's guilt unless the statement appears to be based on information not presented at trial (*People* v. *Kirkes* (1952) 39 Cal.2d 719, 723-724 [249 P.2d 1]; *People* v. *Dale* (1978) 78 Cal.App.3d 722, 733 [144 Cal.Rptr. 338].) No misconduct is shown.

### D.

*Misconduct by the Trial Court*

■ McGinnis claims that the trial court was guilty of misconduct when it questioned the witness Stephen Forsythe about how many times Forsythe had had sexual intercourse with Brown and asked Forsythe to rate her performance.[8]

The evidence showed that before their separation Ray and Brown had been friends and acquaintances of Larry Cook and his wife, defendant McGinnis and Stephen Forsythe and that the lifestyle of the group included a good deal of wife-swapping. For whatever reason, this aspect of the case was continually injected into the trial, not by the prosecution, but by the defense. Thus it was counsel for McGinnis, who asked Cook on cross-examination whether he and his wife had engaged in wife-swapping with Brown and Ray and it was the same attorney who brought out in cross-examination that Stephen Forsythe had also slept with Brown. While the trial court's emphasis of these matters by its questioning of Forsythe was unfortunate and apparently gratuitous, it was not objected to by the defense, presumably because for some reason it was an aspect of the case that the defense wanted to have emphasized. Accordingly, it does not sit well to have the defense now claim

---

[8]The court questioned witness Forsythe as follows: "THE COURT: How many times did you have sexual intercourse with Ramona Brown? THE WITNESS: I couldn't tell you. THE COURT: Give me a rough estimate. THE WITNESS: Two dozen times. THE COURT: Okay. And did these take place in the same location each time? THE WITNESS: Yes, they did.... THE COURT: If you had to rate Ramona Brown's sexual ability, you give me a rating on how this all turns out? THE WITNESS: I could go someplace and get a lot better."

the trial court's action amounted to prejudicial misconduct. (See *People v. Ott* (1978) 84 Cal.App.3d 118, 131 [148 Cal.Rptr. 479].)

E.

### Evidence of a Prior Burglary Committed by Defendant

Over defendant's objection the trial court allowed Larry Cook to testify that he was involved in a burglary at Edwards Air Force Base on May 2, 1977, in which he and defendant McGinnis took tools which were worth between $2,500 and $3,400. The background for this testimony must be explained at length.

In his statement to the police accusing Larry Cook of the murder of Ray, McGinnis suggested that Cook had a motive for killing Ray because Ray had "snitched" on Cook with respect to a burglary that McGinnis and Cook had been involved in at Edwards. McGinnis also told the police that Cook had forced him to go with him when Cook killed Ray by telling him that he would reveal McGinnis' participation in the burglary. The prior uncharged burglary was thus inextricably interwoven in McGinnis' statement to the police which ascribed a motive to Cook. Cook, however, testified that he knew the person who had informed the authorities about the burglary, and that the person was not Ray Brown.[9]

After Cook's testimony the trial court carefully instructed the jury that evidence of the uncharged crime could not be considered to prove that the defendant was a person of bad character or that he had a disposition to commit crime. The court stated that the evidence could only be considered for the purpose of determining if it tended to show the identity of the person who committed the charged crime. The jury was again so instructed at the close of trial.

█ Evidence of other crimes is admissible when offered to prove such issues as motive, opportunity, identity, etc. (See *People v. Perez* (1974) 42 Cal.App.3d 760, 764 [117 Cal.Rptr. 195]; Evid. Code, § 1101, subd. (b).) Admitting evidence of uncharged crimes is within the sound discretion of the trial judge who must weigh the probative value of such evidence against its prejudicial effect. (*People v. Matson* (1974) 13 Cal.3d 35, 40 [117 Cal.Rptr. 664, 528 P.2d 752].) Here

---

[9]McGinnis had not yet testified that he lied when he implicated Cook.

the identity of the murderer was in issue. During the investigation McGinnis, in his attempt to throw blame on Larry Cook, introduced the subject of the burglary. Cook's testimony about the burglary was necessary to show his lack of motive and to explain away McGinnis' accusations. The trial court did not abuse its discretion in allowing introduction of Cook's testimony regarding the burglary.

F.

*Jury View of Crime Scene*

The trial court denied McGinnis' request that the jury be allowed to view the crime scene. McGinnis contends this was an abuse of the trial court's discretion. It was defendant's position that a view of the scene would help the jury "understand the proportions." The court pointed out that the evidence included aerial and close photographs of the crime scene and that, with the passage of time, the scene may have been modified. It is settled that the decision as to whether the jury should view the scene of the crime rests in the sound discretion of the trial court (*People v. O'Brien* (1976) 61 Cal.App.3d 766, 780 [132 Cal.Rptr. 616]; *People v. Wade* (1968) 266 Cal.App.2d 918, 925 [72 Cal.Rptr. 538].) No abuse of discretion has been shown here.

G.

*Defendant's Request for Jury Instruction on Manslaughter and Provocation*

McGinnis requested instructions on manslaughter (CALJIC Nos. 8.37 and 8.40) and provocation bearing on the question whether the murder was of the first or second degree (CALJIC No. 8.73). He contends that the trial court's refusal to give these instructions constituted error.

McGinnis claims the evidentiary basis for a manslaughter instruction is found in the fact that a billy club was found at the crime scene and he claims from this that an inference of mutual combat might be justified. He points to no place in the record where reference is made to a billy club found at the scene, nor does the list of exhibits indicate that any such instrument was introduced in evidence. In any event, McGinnis' confession completely negates any possibility of mutual combat. There he stated that he was "on a block wall" in the garage

area and that Ray did not see him. He stated that Ray "was getting his keys out," and that he had "just turned around towards where I was at" when McGinnis shot him. McGinnis' defense was, of course, that he was not there and he had nothing to do with the shooting. There was no evidence to support a manslaughter instruction.

CALJIC No. 8.73 reads as follows: "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."

The evidence which McGinnis claims supports an instruction on such provocation is a statement made by McGinnis during his confession in response to a question from the police as to why he had killed Ray Brown. McGinnis stated "Well he'd attempted, uh ... to kill me once, and almost killed Ramona thinking I was, it was me in the truck ... one time, plus all the (unintelligible)... the ... molesting the kids ... and he had made it known that he was going to try and kill me." These vague actions and threats unspecified as to time and circumstances do not constitute evidence of provocation such as would justify the giving of the requested instruction. Nor is there any evidence that McGinnis killed while in the grip of passion or any intense emotion. (Cf., *People v. Berry* (1976) 18 Cal.3d 509 [134 Cal.Rptr. 415, 556 P.2d 777]; *People v. Valentine* (1946) 28 Cal.2d 121 [169 P.2d 1].)

The trial court did not err in refusing the requested instructions.

The judgments are affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied June 11, 1981.