[Crim. No. 23420. July 6, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
EDGAR M. HENDRICKS, Defendant and Appellant.

586

**COUNSEL**

Marcus S. Topel, under appointment by the Supreme Court, William M. Goodman, Deborah A. deLambert, Anne E. Thorkelson and Lynne S. Coffin for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Norman H. Sokolow, William R. Weisman, Gary R. Hahn, Robert F. Katz and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.,* § 190.1 et seq.).

As will appear, we conclude that the judgment must be affirmed as to guilt and the special circumstance findings must be upheld. We further conclude that a gross error in connection with the sanity hearing compels us to vacate that verdict and to set aside the judgment as to penalty. The trial judge discharged the jury, empaneled another jury to determine the issue of sanity, and when the latter was unable to reach a verdict, committed the utterly incomprehensible act of recalling the original jurors—more than five months after their discharge and return to the community—to consider the question of sanity. This action was wholly beyond the jurisdiction of the court.

The basic facts relevant to this appeal are undisputed and are in fact supported by two confessions, introduced below, which defendant made in a similar but unrelated case: one to police officers investigating the murders of James Parmer and Charleston Haynes in San Francisco, the other in his trial for those murders.

In the summer of 1980 defendant was without money and was working in Los Angeles and San Francisco as a hustler—a male prostitute for men. In the course of his trade, he would also rob his customers. He met Harry Carter in Los Angeles and had sex with him for money. A week or two later he saw Carter again, and again engaged in an act of prostitution. He lived with Carter for two or three weeks. At the end of that time Carter told him to get out and called him a "low life"; defendant picked up a knife lying on the kitchen table and fatally stabbed him; defendant took various items belonging to the victim and left.

About a month later defendant met James Burchell while he was hustling in Hollywood and went home with him. Once there, Burchell agreed to pay him for sex. During intercourse Burchell expressed dissatisfaction with defendant's performance, a fight ensued, and defendant shot him fatally in the neck. After taking various items belonging to Burchell, he left.

With regard to each victim defendant was charged with murder (Pen. Code, § 187) and robbery (*id.,* § 211). As to each murder four special circumstances were alleged: (1) defendant's prior conviction for the murder of Parmer (*id.,* § 190.2, subd. (a)(2)); (2) his prior conviction for the murder of Haynes (*ibid.*); (3) multiple murder in the present proceeding (*id.,* subd.

(a)(3)); and (4) felony murder-robbery (*id.,* subd. (a)(17)(i)). Defendant pleaded not guilty and not guilty by reason of insanity.

At the guilt phase the jury found defendant guilty as charged and found all the special circumstance allegations to be true. At the penalty phase, they fixed the penalty at death and were subsequently discharged.

On the day set for sentencing, the parties reminded the court that a sanity hearing had not been conducted immediately after the guilt phase, as required by Penal Code section 190.1, subdivision (c). Over defendant's objection that the same jury must determine all the issues in a capital trial, the court empaneled a new jury to decide the issue of sanity alone. After deliberations that spanned 11 days the jurors reported they were hopelessly deadlocked, and a mistrial was declared. Over defendant's further objection, the court then called back the original jurors—who had been discharged more than five months earlier—and reempaneled them without examining them itself or allowing voir dire by the parties. This jury returned a verdict that defendant was sane at the time of the crimes charged. Thereupon the court imposed the sentence of death.

## I.

Defendant makes several contentions relating to the question of guilt. None, as we shall explain, establishes reversible error.

Defendant contends his confession to the police was involuntary and should not have been admitted. Prior to trial he moved under Evidence Code section 402 to suppress the confession, claiming inter alia that it had been improperly procured. After an evidentiary hearing the court ruled the confession was voluntary.

To be admissible at trial the confession of a criminal defendant must have been made voluntarily. (See, e.g., *Payne* v. *Arkansas* (1958) 356 U.S. 560, 561 [2 L.Ed.2d 975, 977, 78 S.Ct. 844]; *People* v. *Jimenez* (1978) 21 Cal.3d 595, 602 [147 Cal.Rptr. 172, 580 P.2d 672].) When a defendant claims that he confessed involuntarily, the prosecution is required under California law to prove voluntariness beyond a reasonable doubt. (E.g., *People* v. *Jimenez, supra,* at pp. 606-608.) As a reviewing court we independently examine the uncontradicted facts to determine whether the trial court's finding of voluntariness was supported. (*People* v. *Jimenez, supra,* at p. 609.) We uphold "the trial court's resolution of conflicts in the evidence ... unless it is 'palpably erroneous'" (*People* v. *Kane* (1984) 150 Cal.App.3d 523, 530 [198 Cal.Rptr. 73]; accord *People* v. *Midkiff* (1968) 262 Cal.App.2d 734, 739 [68 Cal.Rptr. 866]), and "'accept that version of

events which is most favorable to the People, to the extent that it is supported by the record'" (*People* v. *Jimenez, supra,* at p. 609).

The following facts were undisputed at the evidentiary hearing. On March 27, 1981, Officers Brosch and Klotz of the San Francisco Police Department, who were assigned to investigate the Parmer and Haynes murders, received defendant into their custody in Dallas and accompanied him to San Francisco. The next day, they interviewed him about the Parmer and Haynes killings. During the interview defendant confessed to having murdered the two men. Later that day he offered to tell the officers about some other murders if they gave him an alcoholic beverage and a Bible. They accepted his offer and provided him with a Bible, a fifth of whiskey, a can of Coca Cola, and a cup. In the approximately 90-minute interview that followed, defendant confessed to the Carter and Burchell murders. During the interview he mixed and drank two or three whiskey-and-cokes, but was able to comprehend and answer all the questions the officers asked. Neither officer harmed him or threatened him in any way. Prior to the interview he had never disclosed to anyone—including Federal Bureau of Investigation agents who had questioned him in Dallas—any belief or fear on his part that the police would cause him harm.

Two points were in dispute at the evidentiary hearing: first, whether Officer Brosch and his partner, Officer Erdaletz, had told one Agnes Benjamin, a cousin of defendant, that they intended to kill him; and second, how much whiskey defendant drank as he made his confession and whether it affected him to any significant extent.

Defendant testified that Benjamin informed him the officers said they would kill him if he did not turn himself in—and would kill him even if he did; he said this information frightened him and caused him to confess against his will. Defendant also said he consumed all but about four inches of the whiskey, felt "dizzy," and was "talking kind of crazy." By contrast, Officer Brosch testified that neither he nor Officer Erdaletz told Benjamin they intended to kill defendant. He added that defendant drank only about two ounces of whiskey over the course of the entire interview.

■ Defendant unpersuasively argues that the court erred in impliedly finding that the officers did not indirectly threaten him to secure his confession. The record does not allow us to set aside the court's finding and to accept defendant's claim that the officers told Benjamin they intended to kill him and that she communicated that intent to him. In his testimony, which showed no significant weaknesses, Officer Brosch categorically denied that either he or Officer Erdaletz expressed such an intent to Benjamin. And defendant's claim to the contrary appears incredible. He admitted that

before confessing he never told anyone of the officers' alleged intent or his consequent fear. He conceded that it was only the day before the suppression hearing that he disclosed to his counsel Benjamin's alleged communication. Finally, Benjamin, whom he had asked to testify on his behalf, failed to appear to substantiate his claim.

Our conclusion is supported by the words defendant used and the manner in which he spoke them, which were recorded during the interview and played at the hearing: defendant appears to have been motivated not by fear but rather by a desire to ease his conscience. Thus, "It seems inescapable that [defendant's] claim of coercion based on [the alleged] threat was a sham." (*People* v. *Brown* (1981) 119 Cal.App.3d 116, 130 [173 Cal.Rptr. 877].)

Defendant also argues the court erred in impliedly finding that by providing him with whiskey and a Bible the officers improperly induced him to confess. There is no merit to the argument. The officers did not offer him these items in order to secure his confession; rather, he offered to confess if they would provide him with the items and they did so only in response to his request.

Finally, defendant argues in substance that the court erred in finding that his consumption of two or three whiskey-and-cokes did not impair his capacity and render his confession involuntary. This point too is without merit. Just as "The mere fact of ministration of drugs does not establish an impairment of capacity so as to render a confession inadmissible" (*People* v. *Dacy* (1970) 5 Cal.App.3d 216, 220 [85 Cal.Rptr. 57]; accord, *People* v. *Massie* (1967) 66 Cal.2d 899, 906 [59 Cal.Rptr. 733, 428 P.2d 869]), so too the mere fact of voluntary consumption of alcohol fails to establish such an impairment. At the hearing Officer Brosch testified that defendant drank only about two ounces of whiskey during the course of the approximately ninety-minute interview; defendant testified otherwise. Expressly relying on its review of the tape recording of the interview, the court determined "there was no effect of the alcohol . . . ." Because the court's resolution of this conflict in the evidence is not palpably erroneous, and indeed is strongly supported by the undisputed fact that defendant was able to comprehend and answer all the questions posed to him, we may not set it aside.

In conclusion, we find no reason to overturn the court's determination that defendant was neither coerced into confessing by any threat nor induced by any promise nor incapacitated by the consumption of alcohol. Thus, we cannot hold erroneous the ruling that his confession was voluntary.

 Defendant next contends that the defense presented on his behalf amounted to no defense at all and was therefore tantamount to a guilty plea, and hence that under *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], and *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], the court should have obtained from him a personal, on-the-record waiver of his rights against self-incrimination, to a jury trial, and to confront adverse witnesses.

Defense counsel presented no opening statement, cross-examined only a few of the prosecution's witnesses and those not extensively, stipulated to the admissibility of the confession defendant had made in the earlier San Francisco trial for the murders of Parmer and Haynes, called neither defendant nor any other witnesses, stipulated to defendant's prior convictions for the murders of Parmer and Haynes, and made no closing argument. Defendant declared on the record that he had several discussions about the conduct of the trial with counsel and expressly stated his agreement that he should not testify, that no other witnesses should take the stand, and that closing argument should not be presented.

 In *People* v. *Murphy* (1972) 8 Cal.3d 349, 365-366 [105 Cal.Rptr. 138, 503 P.2d 594], we considered and rejected the same contention that defendant raises here—viz., that when counsel elects to present a "minimal defense" or "no defense at all," the court is required to obtain from the defendant a personal, on-the-record waiver of his *Boykin-Tahl* rights. We explained: "The rationale of *Tahl* and its offspring is to 'assure that the record demonstrably discloses the defendant knows of and voluntarily waives the three specified rights ... surrendered by a guilty plea.' [Citations.] The mandate of *Tahl,* however, applies only to pleas of guilty and situations tantamount to a plea of guilty. [Citation.] *Nothing in our decisions following Tahl indicates that the principles expressed therein were intended to apply to jury trials, even where the evidence of guilt is overwhelming.* When a defendant undergoes a jury trial any competent defense counsel will inform him of his right to call witnesses on his own behalf, of his right to testify or not to testify, and, in the absence of unusual circumstances, will cross-examine the witnesses for the prosecution." (*Id.* at p. 366, italics added; accord, *People* v. *Jackson* (1980) 28 Cal.3d 264, 314 [168 Cal.Rptr. 603, 618 P.2d 149] (plur. opn.).)

We implicitly recognized two points in *Murphy*. First, the *Boykin-Tahl* reasoning applies only when the defendant agrees to a submission procedure, such as a guilty plea or a submission on the preliminary hearing transcript, by virtue of which he surrenders one or more of the three specified rights. Second, there is no such surrender when the defendant undergoes—and thereby exercises *his right to*—a jury trial and has the opportuni-

ty to cross-examine the witnesses against him and to refuse to incriminate himself.

■ The expectation we expressed in *Murphy* is satisfied here. As is manifest from the conduct of the trial, defendant must be deemed to have been informed of his rights by counsel: the case was tried to a jury; prosecution witnesses were cross-examined—albeit not as extensively as he now wishes they had been; and he exercised his right against self-incrimination by not taking the witness stand. Moreover, as defendant himself declared on the record, he had several discussions with counsel about trial strategy and agreed he should not testify, no other witnesses should be called, and closing argument should not be presented.

The cases defendant relies on are not inconsistent with the reasoning of *Murphy* and therefore do not compel us to reconsider its holding. The cases requiring a *Boykin-Tahl* waiver each involve a submission by virtue of which the defendant surrendered at least his right to jury trial: *Brookhart* v. *Janis* (1966) 384 U.S. 1 [16 L.Ed.2d 314, 86 S.Ct. 1245] (submission on a "prima facie case"); *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592 [119 Cal.Rptr. 302, 531 P.2d 1086] (submission on preliminary hearing transcript); *People* v. *Levey* (1973) 8 Cal.3d 648 [105 Cal.Rptr. 516, 504 P.2d 452] (same); *In re Mosley* (1970) 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473] (same); *People* v. *Tran* (1984) 152 Cal.App.3d 680 [199 Cal.Rptr. 539] (midtrial waiver of jury and submission for agreed-on determination); *People* v. *Gray* (1982) 135 Cal.App.3d 859 [185 Cal.Rptr. 772] (stipulation to a bench trial on whether defendant was guilty of second degree murder, voluntary manslaughter, or involuntary manslaughter); *People* v. *Davis* (1980) 103 Cal.App.3d 270 [163 Cal.Rptr. 22] (submission on preliminary hearing transcript).

The other case on which defendant relies—*People* v. *Frierson* (1985) 39 Cal.3d 803 [218 Cal.Rptr. 73, 705 P.2d 396]—is peculiarly inapposite. There Justice Kaus, writing for himself and two other members of the court, concluded only that counsel may not override defendant's decision to present a defense at the guilt phase of a capital trial. He added: "We emphasize that our holding rests on the fact that the record in this case *expressly* reflects a conflict between defendant and counsel over whether a defense was to be presented at the guilt/special circumstance stage. Because an attorney's authority to control the trial proceedings generally includes the power to decide when and if particular evidence should be introduced, there would ordinarily be no reason—in the absence of an explicit indication of a conflict—for a trial court to inquire into the defendant's concurrence with his attorney's actions. Thus, nothing in this opinion is intended to suggest that—in the absence of such an express conflict—a court is

required to obtain an on-the-record, personal waiver from the defendant whenever defense counsel chooses to rest without putting on a defense." (*Id.* at p. 818, fn. 8, original italics.) Here, as we have noted, the record expressly reflects that defendant and counsel were at one in choosing to offer the defense that was in fact presented.[1]

 Lastly, defendant contends the court committed reversible error in admitting certain photographs—specifically, two photographs of Carter's body and the wounds it bore, and a photograph of Burchell while he was still alive.

 As to the Carter photographs defendant's point is without merit. In determining whether a photograph was properly admitted, we ask at the threshold whether it is relevant to any material issue. (*People* v. *Turner* (1984) 37 Cal.3d 302, 320-321 [208 Cal.Rptr. 196, 690 P.2d 669].) Here the answer is affirmative. Because one of the theories on which the prosecution tried the case and on which the jury was instructed was premeditated murder, malice was material and the photographs were relevant to that issue. (*People* v. *Jackson, supra,* 28 Cal.3d at pp. 302-303; *People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) The next question we ask is whether the probative value of the photograph in question is clearly outweighed by its prejudicial effect. (*People* v. *Haskett* (1982) 30 Cal.3d 841, 859 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Cruz* (1980) 26 Cal.3d 233, 253 [162 Cal.Rptr. 1, 605 P.2d 830].) Here the answer is negative. Although " 'murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant ...' " (*People* v. *Pierce, supra,* at p. 211), the photographs were not unduly gruesome.

 As to the Burchell photograph, however, the court did err. There was no dispute as to the identity of the person killed—evidently the only issue on which the photograph was relevant—and therefore the photograph should have been excluded because it bore on no contested issue. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 577-578 [180 Cal.Rptr. 266, 639 P.2d 908], revd. on other grounds *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].) The error, however, must be deemed harmless. "As we have seen, from the evidence presented at the guilt phase this was not a 'close case' in which the jury's sympathy for the victim may

---

[1] The decision on the part of counsel not to present a defense does not involve a question of waiver but rather the issue of effective assistance of counsel. (Cf. *People* v. *Murphy, supra,* 8 Cal.3d at pp. 366-367 [failure to present additional evidence].) In other words, if counsel does not put on a defense, the defendant's only real complaint can be that he was denied effective assistance, not that he was deprived of the opportunity to waive in open court his right to present a defense. (Cf. *People* v. *Mosqueda* (1970) 5 Cal.App.3d 540, 546 [85 Cal.Rptr. 346] [defendant's failure to testify on his own behalf].) Here defendant makes no such complaint.

have led it to improperly convict [defendant]; the evidence of defendant's participation in the crimes was clear and uncontradicted. Accordingly, the admission of the photograph does not warrant reversal." (*Id.* at p. 578.)

## II.

 Defendant contends the prior-murder-conviction special circumstances must be set aside. The predicate murders in this case—those of Parmer and Haynes—were committed after the Carter and Burchell murders. Defendant argues that this special circumstance would apply only if he had both committed and been convicted of a murder before he committed the present capital offenses. The argument rests on the premise that the death penalty is appropriate only when a defendant commits murder after he has been put on notice by a previous murder conviction that if he repeats the crime he might suffer the ultimate punishment. As we shall explain, the argument is unpersuasive.

Penal Code section 190.2, subdivision (a)(2) (hereafter section 190.2(a)(2)), defines the relevant special circumstance as, "The defendant was previously convicted of murder in the first or second degree." The language of the provision is clear: on its face, it refers simply and unequivocally to previous convictions. Moreover, defendant's attempt to supply a strained meaning for the word "previously" rests on the erroneous assumption that unless we accept his interpretation the word is surplusage because the jury cannot find the defendant had been convicted of another murder subsequently to the present trial. Defendant, however, ignores the context of the provision: section 190.2(a)(2) refers to convictions in prior proceedings, in contrast to subdivision (a)(3) of the same section, which defines another special circumstance as, "The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree." Far from superfluous, the word "previously" is thus essential to a harmonious reading of these two subdivisions of section 190.2.

The function of section 190.2(a)(2) is also clear— to circumscribe, as the Eighth Amendment requires (*Zant* v. *Stephens* (1983) 462 U.S. 862, 878 [77 L.Ed.2d 235, 250, 103 S.Ct. 2733]), the classes of persons who may properly be subject to the death penalty. Defendant misconstrues the purpose of the provision, which he inaptly analogizes to statutes aimed at the habitual criminal. (*People* v. *Superior Court* (1930) 208 Cal. 688, 691 [284 P. 449]; *People* v. *McGee* (1934) 1 Cal.2d 611, 614 [36 P.2d 378]; *People* v. *Diaz* (1966) 245 Cal.App.2d 74, 77 and fn. 1 [53 Cal.Rptr. 666].) Unlike recidivism statutes, however, section 190.2(a)(2) is directed neither to deterring misconduct nor to fostering rehabilitation.

The unambiguous language and purpose of section 190.2(a)(2) thus require that a person such as defendant, already convicted of murder in a prior proceeding, must be considered eligible for the death penalty if convicted of first degree murder in a subsequent trial. The order of the commission of the homicides is immaterial.[2]

Defendant also contends that section 190.2(a)(2) requires a finding of intent to kill. Plainly, the provision does not expressly require such a finding. Nor can it reasonably be read to impliedly do so. This conclusion is supported by a reading of the 1978 death penalty law as a whole. The drafters of the initiative evidently knew how to impose an intent-to-kill requirement: in 11 of the 19 special circumstances they included express language requiring a finding of intent to kill. From the fact that they did not include such language in section 190.2(a)(2) we may confidently infer that they intended not to impose such a requirement here.

Our conclusion is also supported by a comparison of the 1977 and 1978 death penalty laws. Former Penal Code section 190.2, subdivision (c)(5), defined the relevant special circumstances as follows: "The defendant was personally present during the commission of the act or acts causing death, and *with intent to cause death* physically aided or committed such act or acts causing death and any of the following additional circumstances exists," including, "The defendant has in this proceeding been convicted of more than one offense of murder of the first or second degree . . . ." (Stats. 1977, ch. 316, § 9, pp. 1257-1258, italics added.) Because the drafters of the 1978 initiative did not retain the phrase "with intent to cause death" or any language to similar effect, they must have intended not to impose an intent-to-kill requirement.[3]

### III.

■ Defendant contends the court committed reversible error when it reconvened the original jurors to sit in the second sanity hearing. We agree.

[2] Defendant argues that unless section 190.2(a)(2) is read as he urges, prosecutors may manipulate the order of trials to maximize the possibility of a death penalty. We are not persuaded that the bare possibility of "manipulation" furnishes sufficient reason to insert into the provision a requirement that neither appears on the face of the statute nor is suggested by any extrinsic aids. Moreover, defendant's concern is purely speculative: there is no indication of manipulation in the present case.

[3] To the extent that *People* v. *Malone* (1985) 165 Cal.App.3d 31 [211 Cal.Rptr. 210], holds that intent to kill is an element of the prior-murder-conviction special circumstance, it is hereby disapproved.

From our conclusion it follows that defendant is properly death-eligible under the 1978 death penalty law. (Pen. Code, § 190.2, subd. (a).) Accordingly, we need not reach the question of the validity of the felony-murder and multiple-murder special circumstance findings.

In *People* v. *Thornton* (1984) 155 Cal.App.3d 845 [202 Cal.Rptr. 448], the Court of Appeal discussed the leading cases on the proper reconvening of a jury. (*People* v. *Romero* (1982) 31 Cal.3d 685 [183 Cal.Rptr. 663, 646 P.2d 824]; *People* v. *Lee Yune Chong* (1892) 94 Cal. 379 [29 P. 776]; *People* v. *Peavey* (1981) 126 Cal.App.3d 44 [178 Cal.Rptr. 520]; *People* v. *Ham* (1970) 7 Cal.App.3d 768 [86 Cal.Rptr. 906], overruled on other grounds in *People* v. *Compton* (1971) 6 Cal.3d 55 [98 Cal.Rptr. 217, 490 P.2d 537]; *People* v. *Grider* (1966) 246 Cal.App.2d 149 [54 Cal.Rptr. 497]; and *People* v. *Powell* (1950) 99 Cal.App.2d 178 [221 P.2d 117].) From these cases it correctly derived the following principles: "Once a 'complete' verdict has been rendered per [Penal Code] section 1164 [i.e., a verdict that has been received and read by the clerk, acknowledged by the jury, and recorded] and the jurors discharged, the trial court has no jurisdiction to reconvene the jury regardless of whether or not the jury is still under the court's control (*Peavey*). However, if a complete verdict has not been rendered (*Powell, Ham*) or if the verdict is otherwise irregular (*Chong, Grider*), jurisdiction to reconvene the jury depends on whether the jury has left the court's control. If it has, there is no jurisdiction (*Chong, Grider*); if it hasn't, the jury may be reconvened (*Powell, Ham*)." (155 Cal.App.3d at p. 855.)

In short, once the court loses control over the jurors, it is without jurisdiction to call them together again. The rule rests on two bases. First, in cases in which the jury renders a complete verdict, the rule is designed to protect the verdict as an operative fact. This court implied as much in *People* v. *Lee Yune Chong*: "'With the assent of the jury to the verdict as recorded, their functions with respect to the case cease, and the trial is closed'; and 'after the verdict is received and the jury discharged, ... the control of the jury and of the court over such verdict is at an end. The court cannot alter it, nor can the jury be called to alter or amend it. As well might any other twelve men be called to alter it as the men who were jurors. The office of a juror is discharged upon the acceptance of his verdict by the court.'" (94 Cal. at p. 385.)

Second, in all cases—and therefore fundamentally —the rule is designed to guarantee a fair trial, controlled by the court and shielded from outside influences. Such a basis is plainly suggested in *People* v. *Thornton,* where the court reasoned: "discharge ... results in sending the jurors back to the outside world freed of all the admonitions that previously guarded their judgments from improper influences. Once freed, the jurors can properly discuss the case with the district attorney and the People's witnesses, they can read about it in the media and they can entertain 'facts' or opinions about it from any source. The essence of cases like *Grider* and *Chong*"—in which jurors left the jury box and reconvening was held improper—"and what distinguishes them from *Powell* and *Ham*"—in which they did not

leave the box and reconvening was held proper—"is the incalculable and irreversible effect of this loss of control . . . . The conclusion is inescapable that a discharge accompanied by loss of control of the jury divests the court of jurisdiction to reconvene them . . . ." (155 Cal.App.3d at p. 856.)

Under the "no reconvening" rule, it is manifest that in the case at bar the court was without jurisdiction to reempanel the original jurors to sit in the second sanity hearing. If a court effectively loses control over jurors who have been out of the jury box a scant nine minutes apparently without exposure to outside influences (*People* v. *Grider, supra,* 246 Cal.App.2d at p. 153), it follows a fortiori that the court lost control over the jurors here: they were interviewed by the prosecutor after the penalty phase and were informed that a San Francisco jury had also sentenced defendant to death, and they had been in the outside world more than *five months* before they were called back to the courtroom. As the prosecutor candidly admitted before the first sanity jury was selected, the original jurors "had been dismissed and had been obviously contaminated in the sense that they had gone back. They had talked to various persons and so forth. And it would be impossible to bring that jury back."

The Attorney General first contends that the "no reconvening" rule does not apply on the facts of this case because the court had not properly "discharged" the original jury and hence did not "reconvene" but merely "reassembled" the jurors. Specifically, he maintains that under Penal Code section 190.4, subdivision (c), the jury that determines guilt must also determine sanity unless the court orders discharge for good cause and with a statement of reasons, and that here the court did not comply with the statutory requirements. But what is crucial for purposes of the applicability of the rule is whether the jurors had in fact been released from the court's control, not whether the release can be labeled a "discharge." As the *Thornton* court soundly reasoned, the rule is predicated on "the effect of discharge on the jury. Regardless of whether and why the discharge may be erroneous, it results in sending jurors back to the outside world freed of all the admonitions that previously guarded their judgments from improper influences." (155 Cal.App.3d at p. 856, italics deleted.) The court is without jurisdiction to reconvene not only when the jury is properly discharged, but whenever, as here, the jury passes out of its control.

The Attorney General next attempts to limit the applicability of the rule to the factual circumstances of the cases from which it is derived, viz., situations in which the jury reached some kind of verdict, whether complete or incomplete. But the fundamental purpose of the rule—to guarantee a fair trial, controlled by the court and shielded from outside influences—is no

less implicated when as here the jurors have not even taken their seats than when they have returned a verdict.

Finally, the Attorney General maintains in substance that the rule should not be applied in this case because its fundamental purpose was satisfied retroactively by the court's general instructions at the second sanity hearing that the reconvened jurors must "determine the facts of the case from the evidence received in the trial and not from any other source" and must not "be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The argument is wide of the mark: to the extent it is relevant at all, it addresses the question whether defendant suffered specific prejudice as a result of the error, rather than whether the court had jurisdiction to reconvene. In any event, if general prophylactic instructions could be deemed to have such power, voir dire and challenges could be dispensed with on the ground that the court could make any juror fair and impartial simply by instructing him to be so—surely an untenable premise.

Because the court was without jurisdiction to reconvene the original jurors, "The proceedings that occurred after the reconvening were ... a nullity" and the sanity determination must be set aside. (*People* v. *Thornton, supra,* 155 Cal.App.3d at p. 856.)

IV.

Defendant raises a number of contentions relating to the issue of penalty, but none need be reached. Because a verdict of legally sane was a prerequisite to conducting the penalty proceeding (Pen. Code, § 190.1, subd. (c)), the judgment as to penalty is unsupported as a matter of law and must be reversed.

The judgment is affirmed as to guilt, the sanity verdict is vacated, and the judgment is reversed as to penalty.

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.