[Crim. No. 39389. Second Dist., Div. Five. Sept. 16, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD VERNON GRAY, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Daniel J. Mangarin, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Sandy R. Kriegler, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**YOUNGER, J.\***—Appellant was convicted of murder in the second degree (Pen. Code, § 187 et seq.)[1] following his stipulation to a trial without a jury in a "hybrid procedure" whereby he agreed he was guilty of at least involuntary manslaughter in exchange for the district attorney's reduction of the maximum charge to second degree murder. The trial court was then asked to determine whether defendant was guilty of one of those offenses or voluntary manslaughter, falling between them.

The principal question on appeal is whether, as appellant contends, the procedure amounted to his pleading guilty to one crime and then

---

\*Assigned by the Chairperson of the Judicial Council.

[1]All statutory references are to the Penal Code unless otherwise indicated.

being tried for another in violation of the "double jeopardy" provisions of the state and federal Constitutions. We hold that it did not, and affirm the conviction, touching only briefly on appellant's attacks on the sufficiency of the evidence and the admission of certain out-of-court statements, which we do not find substantial issues.

The circumstances of the killing to which appellant admits are common, tragic and, for the purposes of this appeal, simple: Appellant was hitchhiking in the Ventura area, ultimately taking up company with three other young people, including the victim Elza Tibbets (Tibbets) and one Karen Laird (Laird). After spending several hours together drinking, consuming drugs and talking, appellant, Laird and Tibbets spread out sleeping bags for the night under some trees.

Sometime after 2 a.m., a fight between appellant and Tibbets ensued. Laird, called by the district attorney, testified that appellant was the aggressor, and this version was supported by appellant's taped statement given to the investigating officers some months later and by the testimony of one Prizzi, his cellmate (while awaiting trial) in Ventura.

Regardless of how the fight started, the evidence showed that Tibbets had been stabbed 34 times, but was crawling around and screaming for help, when appellant hit him over the head with a blackjack. Appellant and Laird then took some of Tibbets' belongings and fled the area.

According to the autopsy, the victim died from "loss of blood and respiratory difficulty" as a result of the wounds, most of which were "superficial," and he may have lived for "several hours" after they were inflicted.

### SUFFICIENCY OF THE EVIDENCE

■ While the causes, origin and scenario of the fight were somewhat in question, all the facts and issues in the case, including discrepancies in the witness' accounts[2] and the defendant's assertion of self-defense or, alternatively, of an honest (albeit unreasonable) belief that he was in mortal danger (see *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]) were extensively analyzed on the record by the trial judge.

---

[2]While legally significant differences in the various witnesses' versions were indeed present, factually the discrepancies were very modest.

While appellant questions the sufficiency of the evidence to support his conviction for murder (as opposed to manslaughter), he correctly summarizes the sufficiency of evidence issue with the question, could a "rational trier of fact ... have found the essential elements of the crime beyond a reasonable doubt[?]" (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].)

A review of the entire record makes it clear that the trial court could —and did—so find.

### APPELLANT'S OUT-OF-COURT ADMISSIONS

■ Appellant contends that a statement obtained from him by Ventura detectives, while he was in the Los Angeles County jail on unrelated charges, was in contravention of the principles of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 9 A.L.R.3d 974]. Accordingly, he argues the trial court erred in overruling his objection to admission in evidence of a tape of the interview.

Appellant's complaint is that prior to advising him of his rights, the officers informed him that they had a warrant for his arrest for the homicide of Tibbets and they told him of considerable evidence pointing to his involvement in the death. Appellant was *then* read his rights and thereafter gave an extensive statement in which he admitted personally stabbing Tibbets.

According to appellant, this *preadmonition* recitation by the officers amounted to "a clever softening-up" of appellant, making his subsequent decision to speak to them less than voluntary, even after a "normal" admonition and waiver of "*Miranda* rights." In taking this position, appellant compares himself to the accused in *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050].

While not unmindful that the entire "softening-up" issue in *Honeycutt* was dicta joined in by at most four justices,[3] its admonition that reviewing courts should look to surrounding circumstances suggestive of

---

[3]Even assuming arguendo that all who joined in a reversal of a conviction in that case on other grounds agreed on this issue.

involuntary statements notwithstanding apparently "normal" waivers is appropriate.[4]

But factually, *Honeycutt* bears little resemblance to the present case. Honeycutt was a suspect in a killing, and had been arrested, when the following occurred: ". . . defendant was placed in the back seat of a patrol car. He was not advised of his *Miranda* rights. Detective Williams tried to talk to defendant who looked back silently at the officer. During the short ride to the police station, however, defendant volunteered that Williams knew him under a different name. At that point Williams recognized defendant whom he had known through police contacts for about 10 years. .... [Later at the station] Williams mentioned that the victim had been a suspect in a homicide case and was thought to have homosexual tendencies. Although he stated that he did not expect defendant to talk about the offense, Williams testified that 'It was my duty to continue the efforts to try to get him to talk. And I was successful in it.' In the course of their interview Williams 'could see that [defendant] was softening up.' Williams said that they stayed away from a discussion of the offense, but by the end of the half-hour defendant indicated that he would talk about the homicide. [¶] Defendant was first advised of his *Miranda* rights in the presence of a reporter three hours after his arrest. When asked whether he understood his rights defendant replied, 'I heard what you said, Mr. Johnnie, but I have no rights.' Williams asked again if defendant understood his rights and defendant said, 'Yes, I understand all my rights.' He then expressly waived his rights and confessed . . . ." (20 Cal.3d 150, at pp. 158-159.) (Citations omitted.)

In the instant case, appellant and the officers spoke for perhaps five minutes before he was admonished *orally and in writing* of his *Miranda* rights. Thanks to the professionalism of Detectives Hayes and Haas in their taping of the statement, there was little room to argue at trial that the waiver was not complete and unequivocal.

Appellant appends a transcript of the tape to his opening brief. While instructive, this exhibit contains his own undoing in two ways: Most simply, it visually illustrates the *brevity* of the preadmonition conversation as the *Miranda* admonition begins in the middle of the third page

---

[4]The view of a police officer, played by Sylvester Stallone, in the movie "Nighthawks" giving *Miranda* rights while dragging a suspect by the hair along a subway platform is better cinematography than constitutional law.

of a 59-page transcript. This is hardly the "softening-up" condemned in *Honeycutt, supra,* 20 Cal.3d 150.

Secondly, however, the transcript reflects that Detective Haas' recitation of the facts was accurate, dispassionate and not remotely threatening. Far from being "softened-up" like Honeycutt, who claimed "I have no rights" (20 Cal.3d 150, 159), appellant's last statement *before being advised of his Miranda rights* was a *denial that he had ever been in Ventura at all.*

The key issue under *Miranda* has not changed since 1966: It is still *voluntariness.* The officers' conduct here was appropriate. (*People* v. *Posten* (1980) 108 Cal.App.3d 633, 647 [166 Cal.Rptr. 661]; *People* v. *Patterson* (1979) 88 Cal.App.3d 742, 750-752 [152 Cal.Rptr. 183]; *People* v. *Kyllingstad* (1978) 85 Cal.App.3d 562, 566-567 [149 Cal. Rptr. 637].)

Appellant also now contends, somewhat speculatively, that the interrogation in the jail was postcomplaint-filing questioning of a defendant in the absence of counsel in violation of *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. But, as this point was never raised prior to this appeal, we have no way of knowing anything of the timing, save for appellant's speculation. This situation is a good example of the *reason* why an appellate court must not become a forum for issues not raised in the trial court. (E.g., *People* v. *Privitera* (1979) 23 Cal.3d 697 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R. 4th 178], cert. den. (1979) 444 U.S. 949 [62 L.Ed.2d 318, 100 S.Ct. 419].) Here, the trial court even invited discussion of the issue, but appellant's trial counsel (quite probably because he knew that factually he had no issue) declined the invitation.

## DOUBLE JEOPARDY

Appellant contends that the "hybrid procedure," to which he and his counsel agreed, amounted to his pleading guilty to one crime (involuntary manslaughter) and his then being tried for another (second degree murder) in violation of the double jeopardy provisions of the state and federal Constitutions. (Cal. Const. art. I, § 15; Pen. Code, §§ 687, 1023.)

Appellant argues that the trial "... court entered, on the record, its 'acceptance and approval' of appellant's plea." But the trial court, in fact, only "accept[ed] and approv[ed] the *stipulations entered into* ..." and held a substantial discussion of the procedural posture of the case with both counsel and the defendant personally, thus putting the agreement into its proper context.

The appellant's characterization of the events suggests a "normal" plea of guilty, complete with "normal" admonitions and waivers pursuant to *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449] followed almost inexplicably by a trial (as if what appellant claims to be a guilty plea were summarily forgotten) on a greater offense, necessarily including the one pled guilty to moments earlier. This characterization is inaccurate.[5]

While not dispositive of the issues, a glimpse at the thinking, at the time of trial, of the trial judge, counsel *and the appellant*, is provided by the *order* in which the procedures were discussed. The initial discussion, when the case was called for trial, is of the parties' desire to waive a jury trial. After the court and counsel had exchanged greetings, the following occurred:

"THE COURT: All right. It is my understanding that Mr. Gray has waived a jury trial, but before I undertake to try this case without a jury I want to make certain that that is the posture of the case, Mr. Dammeyer.

"MR. DAMMEYER [Defense Counsel]: That is the posture. There are some conditions attached to the jury waiver and I think we have prepared a waiver and a taking of plea *to the extent that it applies*; that is, pleading to involuntary manslaughter at least, and I think that's all covered. Probably cover it all at the same time.

---

[5]About the only basis upon which one could think appellant's stipulation to the procedure was tantamount to a plea of guilty having been already accepted by the court is to be found in the prosecutor's opening remarks:

"First degree murder is precluded by this agreement. So to put this in simpler language, you are *already found guilty* of involuntary manslaughter if the Court accepts this disposition." (Italics added.)

We are hesitant to criticize the language of an obviously able prosecutor seeking to meaningfully explain the situation to a defendant "in simple language," though "already found guilty" was perhaps not a felicitous phrasing of the issue. But if this was a linguistic slip, at least four factors support a finding that it was a profoundly insignificant one: In telling Gray that he was "already found guilty," the district attorney (i) was wrong, (ii) was, if anything, "*over* warning" appellant, (iii) laudably trying to be clear to the defendant, and (iv) not objected to by defense counsel.

"MR. DOBROTH [Deputy District Attorney]: I'm prepared to arraign the defendant on the waiver of the jury trial and on the plea *to the extent taken.* I think at the end of my discussion with the defendant and counsel the Court will be fairly well apprised to where we are.

"THE COURT: All right. Mr. Gray, I want to request that you listen carefully to Mr. Dobroth's statement. I[f] you have any questions concerning it we'll certainly permit you talk with your attorney about it, but I want to urge you now to pay close attention so that if I ask you any questions or the District Attorney asks you any questions concerning your position about the plea and the stipulation that you will be able to answer the question based on your full knowledge and understanding of what's going on. So please pay close attention." (Italics added.)

The prosecutor then read into the record, by way of an arraignment of appellant, an agreement about the nature of the proceedings, already prepared in writing and executed by both counsel and the appellant personally.

"And this agreement states that Defendant Edward Vernon Gray hereby waives his right to trial by jury and will be tried by Judge Thompson in a Court trial. Pursuant to the attached felony disposition agreement, which is this piece of paper here, the defendant Edward Vernon Gray hereby admits that he is guilty of involuntary manslaughter and waives his right to jury trial as to the question of greater culpability of voluntary manslaughter or second degree murder.

"The Court will determine whether the defendant Edward Vernon Gray is guilty of involuntary manslaughter with a maximum punishment of two, three or four years in State prison as you've agreed to plead to, or voluntary manslaughter with the maximum of two, four or six years in State prison, or second degree murder with a maximum of 15 to life in State prison.

"First degree murder is precluded by this agreement. So to put this in simpler language, you are already found guilty of involuntary manslaughter if the Court accepts this disposition. The Court still could find you guilty of a greater crime, voluntary manslaughter or second degree murder, but the Court cannot—the Court will be [b]ound not to find you guilty of first degree murder."

As will be noted, the appellant had also executed a "Felony Disposition Agreement" printed form (appendix A to this opinion). It appears to be a normal sort of printed change-of-plea form, such as have come into use in many counties since *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal. Rptr. 577, 460 P.2d 449] with check boxes and spaces for defendant and his counsel to sign and initial. Significantly, it has been modified in several respects (*E-X* "The maximum possible term in state prison is *15 to life* year(s). *Pursuant to attached agreement.*") (Italics denote blank areas filled in by defendant's handwriting.)[6]

Following the discussion of the *two* written agreements, the arraignment moved into an oral on-the-record discussion of rights being waived, rights being preserved and general ground rules, each appropriate to the context of the "hybrid procedure."

This actually put the trial court in the position of "taking waivers" while *not* actually accepting the plea, again, unusual but, where stipulated to, not violative of any right of the appellant. The point was illustrated by some closing colloquy between the deputy district attorney and the judge:

"MR. DOBROTH: Essentially what the Court is doing is sort of delaying the acceptance of the involuntary manslaughter plea. In other words, if we were just taking a straight out plea now the Court would now make that determination. But in a sense you are delaying that until the end of the evidence so that you could possibly conclude another degree or type of crime.

"THE COURT: Yes, that's correct."

The potential for a procedure which is in some ways a "disposition" and, in others, clearly a "trial" is treated at length in *Bunnel v. Superior Court* (1975) 13 Cal.3d 592, 602 [119 Cal.Rptr. 302, 531 P.2d 1086] (and cases cited therein), dealing particularly with the "submitted on transcript" type of arrangement. (See *In re Mosley* (1970) 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473], cert. den. (1970) 400 U.S. 905 [27 L.Ed.2d 142, 91 S.Ct. 144].) The procedure in the instant case wasn't closely analogous to the "submitted on transcript" or "slow

---

[6]While the form's use appears satisfactory when a thorough search of the record is made and the overall context is apparent, the People would do well to "tailor-make" a document instead of modifying this somewhat less appropriate one.

plea" of *Mosley* or *Bunnel*, but the overriding principle therein—that a defendant must clearly and expressly waive any constitutional rights which, in the procedure confronting him he will not fully enjoy—clearly applies here. (*Bunnel, supra,* 13 Cal.3d at p. 605; see *People* v. *Casarez* (1981) 124 Cal.App.3d 641 [177 Cal.Rptr. 451].)

Another way of expressing the point is that *Bunnel* requires a "tailor-made" style of advice and waivers in the context of any procedure which is less than or different from a full-blown jury trial. The procedures reflected in the record in this case clearly meet this standard.[7]

---

[7]The deputy district attorney went into some detail in explaining the procedure to appellant:

"And the first thing it discusses is that you're going to change your plea from not guilty as to part of this crime—that is, you are going to change your plea to guilty to involuntary manslaughter and submit issues of greater culpability to a Court trial pursuant to this agreement we just discussed. So these two agreements relate to each other. [¶] Now, are you entering this plea voluntarily and not as a result of any force, pressure, threats or coercion brought against you or any member of your family and because no promises have been made to you other than those appearing on this form; is that correct?

"THE DEFENDANT: Right.

"MR. DOBROTH: Have you discussed the facts of the case against you and all the defenses you might have with your attorney?

"THE DEFENDANT: Yes.

"MR. DOBROTH: Has your attorney explained to you the direct and indirect consequences of this plea including the maximum possible sentence?

"THE DEFENDANT: Yes.

"MR. DOBROTH: Do you understand that the consequences of this [plea] or the arrangement which we've made including the plea could be up to 15 years to life if you were found guilty by the Court of second degree murder?

"THE DEFENDANT: Yes.

"MR. DOBROTH: That you also understand that the involuntary manslaughter plea which you've agreed to already means that you have been found guilty and could be sentenced to at least two, three or four years in State prison on the involuntary manslaughter alone?

"THE DEFENDANT: Yes.

"MR. DOBROTH: You understand because of your age it's possible that you could be sent to the California Youth Authority?

"THE DEFENDANT: Yes.

"MR. DOBROTH: Has your attorney explained to you and do you understand that the plea will result in your conviction and therefore you're [*sic*] waiving or giving up each of the following Constitutional rights to the extent that you are pleading guilty to involuntary manslaughter, and in some respects you're not giving up all of these rights because you will have a Court trial? [¶] But regarding the right to a jury trial that you're going to give up your right to have each and every charge and allegation determined by a jury of twelve persons. Do you understand that?

"THE DEFENDANT: Yes.

"MR. DOBROTH: Do you wish to give up that right?

"Standard" double jeopardy cases involving multiple prosecutions cited by appellant (e.g., *People* v. *Goldstein* (1867) 32 Cal. 432; *People* v. *Krupa* (1944) 64 Cal.App.2d 592 [149 P.2d 416]) have no applica-

---

"THE DEFENDANT: Yes.

"DR. [*sic*] DOBROTH: Secondly, you will still have the right to confront and through your attorney cross examine each witness called by the prosecution to prove your guilt. But you won't have the right to do that in front of a jury. The judge will be hearing the evidence. Is that understood?

"THE DEFENDANT: Yes.

"MR. DOBROTH: Also you have the right to be represented at all times during trial by a competent attorney and to have the Court appoint one to represent you at no charge if you can't afford one. [¶] You will have an attorney with you during this Court trial. It won't be in front of a jury. Do you understand that?

"THE DEFENDANT: Yes.

"MR. DOBROTH: And also you have the right against self incrimination which means you would not have to testify at your trial and if you didn't the jury can't consider that as evidence of your guilt or the Court couldn't consider it as evidence of your guilt. Do you understand that?

"THE DEFENDANT: Yes.

"MR. DOBROTH: Now, you are giving up that right to the extent of being convicted of involuntary manslaughter. You are not waiving your right against self incrimination as to voluntary manslaughter or second degree murder. Do you understand that?

"THE DEFENDANT: Yes.

"MR. DOBROTH: You will not have to testify if you don't want to and no one can make you and no one can consider the fact that you don't against you. Do you understand that?

"THE DEFENDANT: Yes.

"MR. DOBROTH: The District Attorney didn't make any promise regarding what sentence you'll get as a result of this disposition. But we do promise that you'll get credit for any time you've already served against your sentence and we also promise that you will not be found guilty of first degree murder. Do you understand that?

"THE DEFENDANT: Yes.

"MR. DOBROTH: Do you agree that as to all counts, prior enhancements that are involved—

"MR. DAMMEYER: That doesn't apply.

"MR. DOBROTH: All right. Strike the subject of the Harvey Waiver. [¶] I have— have you read and discussed with your attorney each item on this form and have initialed the ones that are appropriate according to the form?

"THE DEFENDANT: Yes.

"MR. DOBROTH: And you've signed this document?

"THE DEFENDANT: Right.

"MR. DOBROTH: And Mr. Dammeyer signed it?

"MR. DAMMEYER: Yes.

"MR. DOBROTH: And I've signed it. [¶] Your Honor, at this time I will give the Court two separate documents. One is a one page three paragraph stipulation between Counsel, the defendant and myself. And the other is a two page four sided document entitled Felony Disposition Agreement form. [¶] They're both referred to by cross reference to each other and should be filed as a single document that will memorialize this disposition we've just arranged and the waiver of jury trial.

· "THE COURT: All right. Mr. Dammeyer, do you join in the statements and concurrences of your client?

"MR. DAMMEYER: Yes, I do."

tion to the situation here, nor does appellant's general "due process" argument which appears to be a make-weight not accompanied by a citation of authority.

Affirmed.

Feinerman, P. J., and Stephens, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 10, 1982. Newman, J., and Kaus, J., did not participate therein.

## APPENDIX A

### II.

### SENTENCE

A.  The District Attorney's Position is: (Deputy District Attorney to initial)

_x_ No sentence commitments.

____ The defendant shall not now be committed to state prison. The defendant may at a later time be committed to state prison if a court finds he has violated probation.

____ The offense(s) shall be declared or made a misdemeanor.

_x_ The defendant shall receive credit for time served.

_X_ The People agree that the defendant d&D. Can not be found guilty of 1st degree murder

B.  The Court's Commitments, if any, are:

____ _____

____ _____

C.  Harvey waiver: (Defendant to initial)

____ The defendant agrees that as to all counts, priors and enhancements that are dismissed, information pertaining to such counts, priors, and enhancements may be included in the probation report and considered by the Court in determining sentence.

### III.

### DEFENDANT'S AND DEFENSE ATTORNEY'S AGREEMENT

I have read, discussed with my attorney, and understand each item on this form and have initialed each section to so indicate; I request the Court to accept this plea.

DATED: ___9-30-80___          ___Eddie Gray___
                                (Defendant's signature)

I have explained to the defendant all of his constitutional rights and I am satisfied he understands them and also understands that by entering this plea he is giving up each of them. I have discussed the facts of the case and all possible defenses to the charges with the defendant. I have explained the direct and indirect consequences of this plea to the defendant and am satisfied he understands them. I am satisfied the defendant is voluntarily and of his own free will seeking to enter this plea. I request the Court to accept this plea.

DATED: ___Sept 30, 1980___          _____
                                (Defendant's Attorney's signature)