[No. H006276. Sixth Dist. Apr. 30, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
NAM VAN HUYNH, Defendant and Appellant.

[No. H007712. Sixth Dist. Apr. 30, 1991.]

In re NAM VAN HUYNH on Habeas Corpus.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 4, 5, and 6B.

COUNSEL

Norton Tooby, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Laurence K. Sullivan and Rene A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**AGLIANO, P. J.—**

1. *Introduction*

Defendant Nam Van Huynh appeals from the judgment following his conviction after court trial of second degree murder with personal use of a .38-caliber revolver. (Pen. Code, §§ 187, 1203.06, 12022.5.) He also peti-

tions for a writ of habeas corpus. On November 5, 1990, we ordered the petition considered with defendant's appeal and allowed the People to file an informal reply and defendant an informal response.

In the trial court, in exchange for eliminating defendant's exposure to special circumstances and first degree murder, he waived preliminary examination and submitted to a court trial to determine, based on police reports, taped statements by defendant, and defendant's testimony, whether he was guilty of second degree murder or manslaughter. Defendant was sentenced after conviction to 17 years to life in prison, the court adding 2 years for his personal use of a firearm.[1]

Defendant's habeas petition alleges that trial counsel was unconstitutionally ineffective in misadvising him about how soon parole was available after a second-degree murder conviction and in failing to pursue the possible defense of unconsciousness. On appeal defendant makes the latter point as well as four others. Defendant asserts the trial court erred by failing to obtain his waiver of the right against self-incrimination upon defendant's submission to court trial on the evidence above described. Defendant contends he was deprived of his rights to counsel, to an interpreter, and to have the trial judge preside at the posttrial hearing of defendant's motion for new trial. The facts are set out where relevant.

In response to the habeas petition, we will issue an order to show cause limited to defense counsel's alleged misadvice about parole eligibility. On the appeal, for the reasons stated below, we will affirm the judgment, finding no error except for lack of waiver of the right against self-incrimination and no prejudice from that error.

## 2. *Trial evidence*

The central issue at trial on August 17, 1989, was defendant's mental state when he shot his estranged wife to death on a street in San Jose shortly after 8:30 a.m. on Tuesday, November 8, 1988. The coroner reported the victim received five bullet wounds including two to her head.

Witnesses saw defendant standing outside his wife's car arguing with her inside the car. One resident of the neighborhood said defendant became "increasingly aggressive," patted his right hip to indicate he had a handgun, and pulled the gun out. The neighbor called out from her yard that she was going to call the police. Defendant stepped in front of his wife's car and hit

---

[1] At the time of the killing, Penal Code section 12022.5 provided for a two-year enhancement for personal use of a firearm. (Stats. 1987, ch. 1159, § 1, p. 4088.)

the window with his pistol as she sounded the car horn. After defendant fired three shots, his wife's car coasted across the street, rolled over the curb, and stopped. Defendant walked up to the car, reached in with the gun, and fired two more shots. Defendant placed the gun on the trunk of the car and sat on the curb until the police arrived. Another passerby said he saw defendant reload before catching up to the car and fire more shots into the car. A crossing guard said that defendant fired one shot, paused six to eight seconds, fired three shots rapidly, and fired one final shot after the car came to rest.

Defendant was sitting on the curb when the first police officer arrived. He frisked defendant and located four cartridges in his left front coveralls pocket. The first officer told another officer he was frisking defendant for a gun. Defendant said, "The gun is on the car."

Defendant made a taped statement to the police after waiving his *Miranda*[2] rights. He made another taped statement to homicide detectives shortly before 10 a.m. Both tapes were in evidence.

During the police interviews and at trial, defendant explained his relationship with his wife as follows. In 1973 they met and married in Vietnam when he was 35 years old and she was 17. They had one son in 1974 and came to the United States of America in 1975. They moved to France for five years and to San Jose in 1980. They owned a fish company. They had another son in 1980 and a daughter in 1981. Although his wife was a prostitute when they met, she behaved very well once they married, until 1986. In 1986, she left the family and spent all their money on her boyfriend. This bankrupted defendant. When the boyfriend kicked her out, defendant took her back as his wife. Defendant admitted beating her in 1986 for giving her boyfriend their money.

Defendant went to work as a salesman for a fish company. His wife began working at a donut shop. She became involved with the shop's manager in early 1988.[3] Once she showed defendant a bullet and said she would kill him with it. He never saw her with a gun although she mentioned one several times.

Defendant and his wife separated in August. She had the police remove defendant from their apartment. He took up residence in an undeveloped area in the back of his place of employment.

[2] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[3] Following dates in this part are from 1988.

On September 28 defendant acquired a new handgun in exchange for an older one. He went to a shooting range a couple of weeks later. He kept the gun loaded in his pocket or in a box which he kept either in his car or in a drawer where he lived and worked. He had carried the bullets found in his pocket for several weeks.

On October 18, defendant's wife obtained a court order restraining him from asking their children for her address and telephone number and from following anyone to her residence.

His business was closed for repairs in mid-October. For three weeks he sold cheap jewelry at a weekend flea market. Defendant was depressed and often thought of suicide after his wife kicked him out of the house and he did not have his job. He did not kill himself because of the children.

On Sunday, November 6, defendant was unable to meet his children as prearranged because he was working at the flea market. He wanted to see them the next day. On November 7, he signed a divorce paper after the secretary of his wife's attorney told him his failure to sign it was the reason his wife had not brought their children to meet him. The same day defendant found out his wife's new address through the Department of Motor Vehicles. She was using a car he had purchased.

In the morning of November 8, defendant drove to his wife's residence to talk to her about not bringing the children on Sunday. He brought the gun to shoot her and himself. He had frequently dreamt of them shooting each other. He saw his elder son that morning on the way to school and gave him a ride part way there. His son told him they had waited for him on Sunday. He told his son to bring the other two children and meet him at a market the following day without telling their mother.

Defendant returned to his wife's residence and knocked on the door. He indicated to her by words and gestures he wanted to talk elsewhere due to the restraining order. They drove in separate cars to another street where she stopped behind him. He went to talk to her through a window lowered about four inches. They talked about money and how her extramarital affair could hurt the children. She turned the steering wheel toward him and said she had a gun in the car. He did not see it. He patted his hip, saying he had a gun too. She told him she did not care about money, the children, him, or anything.

Defendant recalled taking the gun out of his pocket and banging on the window with the handle of the gun as she honked the horn. He used the point of the gun to break the window. Defendant remembered nothing after

hearing the first shot except for following the car, putting the gun on the trunk, and sitting on the curb with his hands on his head. He did not remember reloading the gun. When asked if he knew what he was doing, defendant answered, "No. I was kind of crazy that moment, so depressed after three month, after I shot her, and I felt some kind of headache and so tired, and I sit down. I had some kind of a no thinking during that moment." He also explained, "After I heard the first shot, I became some kind of unconscious. I only remember that I put the gun . . . in the top of it." When asked if he knew whether it was right or wrong, he answered, "I had some kind of mental crisis. I knew nothing. I knew nothing wrong or right." By the time of trial he realized it was wrong to destroy a family.

Defendant denied beating his wife in 1988 and said he had only beaten her twice. The elder son said he slapped her twice in 1988. She asked a male friend to move in with her for protection. This housemate said she was divorcing defendant as she was tired of being beaten. She was afraid of defendant as he was constantly violent toward her.

### 3. *Advice and waiver of right against self-incrimination*

 Defendant contends the trial court erroneously failed to obtain his waiver of his right against self-incrimination prior to the above described submission. We review the proceedings of which defendant now complains.

### A. *Pretrial waivers*

On March 9, 1989, defendant waived his right to a preliminary examination on the condition that the People not allege special circumstances or first degree murder. On June 12, 1989, defendant waived jury trial in superior court before Judge Zecher, "with the understanding that the matter will be tried before the Court, with the People stipulating that murder of the first degree will be eliminated and excluded from the Court's consideration. The Court then will make a determination, based upon the evidence presented to the Court by way of a Court trial, as to whether this is a manslaughter or a murder of the second degree." Through interpreter An Tranh defendant was informed of his right to jury trial and acknowledged having discussed his defenses with his counsel. The following colloquy ensued.

The court: "So, you understand the maximum punishment, now, is fifteen to life, with two years if the firearm is found to be true, that allegation. So it would be seventeen to life, do you understand that?"

Defendant: "Yes."

The court: "Okay. And he would come up for parole when?"

Defense counsel: "He would be eligible for parole at the end of seven years."

Prosecutor: "I would say probably seven, eight."

Defense counsel: "Seven and a half."

The court: "You would be eligible for parole between seven and eight years. Do you understand that?"

Defendant: "Yes."

After further inquiries of defendant, defense counsel stated: "Just so it's clear, what Mr. Huynh is going to be asking this Court to do is consider the evidence presented and make a determination independently as to whether this act constituted murder of the second degree or manslaughter. That's what he's asking the Court to do." When the court inquired whether defendant understood, he answered, "Yes."

The People and defendant waived jury trial, the court finding defendant's waiver to be free, voluntary, and knowing.

On August 17, 1989, at the outset of court trial, the prosecutor stated, "I believe there is going to be a waiver as to the defendant's right to confront and cross-examine witnesses." The following colloquy ensued.

Defense counsel: "That's correct, Your Honor. The proceeding this morning will basically be presented to the court by way of various—"

Prosecutor: "Documentation."

Defense counsel: "—reports that have been compiled by the District Attorney and will be submitted to the Court for the Court's consideration as evidence; there will also be two tapes played for the Court of statements given by Mr. Huynh shortly after the incident; and then Mr. Huynh will be taking the stand to testify; and there will be no confrontation or cross-examination of any live witnesses that would otherwise be presented by the District Attorney."

The court: "Would you say this is within the spirit of *Bunnell*?"

Defense counsel: "No, it's not; this is a full Court trial—"

The court: "Full-blown Court trial."

Defense counsel: "—for the Court's determination as to whether this is a manslaughter or a second degree murder, Your Honor."

Prosecutor: "That is correct, Your Honor."

Defense counsel advised defendant of his right to confront and cross-examine the witnesses against him and he waived that right.

Defense counsel advised defendant that after presenting the police reports, defendant's statements and his testimony, "we will ask the Judge to make a decision, based upon the law and the evidence as presented, as to what degree this homicide is. Do you understand that?" Defendant answered that he did. Defense counsel reiterated, "There is one further stipulation, which I believe may have already been said on the record, and that is the degree of first degree murder is eliminated and will not be before the Court for the Court's consideration. It will be either second degree or manslaughter, and the Court will make that determination."

The court advised defendant that the maximum punishment he faced for conviction of second degree murder with the use of a weapon was 17 years to life. Defendant said he understood that. The court found defendant's waiver of his right to confront and cross-examine witnesses against him to be free, voluntary, and knowing. There was no advice or waiver of defendant's right against self-incrimination.

B. *Should defendant have been advised of and waived his right against self-incrimination?*

The main issue in *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592 [119 Cal.Rptr. 302, 531 P.2d 1086] was whether a defendant was once in jeopardy when he submitted to court trial on the transcript of the preliminary examination while reserving the rights to testify and to cross-examine the authors of any documents used by the prosecution in rebuttal. (*Id.* at pp. 598-599.) In the course of answering this question, the court recognized that some submissions are tantamount to a plea of guilty while in others defendants actively contest guilt. (*Id.* at pp. 602-605.) The court stated: "[A]lthough some of our requirements are not constitutionally compelled, we have concluded that . . . in all cases in which the defendant seeks to submit his case for decision on the transcript or to plead guilty, the record shall reflect that he has been advised of his right to a jury trial, to confront and cross-examine witnesses, and against self-incrimination. It shall also demonstrate that he understands the nature of the charges. Express waivers

of the enumerated constitutional rights shall appear. In cases in which there is to be a submission without a reservation by the defendant of the right to present evidence in his own defense he shall be advised of that right and an express waiver thereof taken. If a defendant does not reserve the right to present additional evidence and does not advise the court that he will contest his guilt in argument to the court, the defendant shall be advised of the probability that the submission will result in a conviction of the offense or offenses charged. In all guilty plea and submission cases the defendant shall be advised of the direct consequences of conviction such as the permissible range of punishment . . . ." (*Id.* at p. 605.)

As *People* v. *Wright* (1987) 43 Cal.3d 487, 492 [233 Cal.Rptr. 69, 729 P.2d 260], explained, "'A defendant who by his stipulation permits the prosecution to prove its case without requiring the production of any evidence in court, other than the transcript of a prior hearing, furnishes far more than a mere link in the chain of evidence.' (*People* v. *Levey* [1973] 8 Cal.3d [648] at p. 652 [105 Cal.Rptr. 516, 504 P.2d 452].) He necessarily forfeits his constitutional right against self-incrimination. In such cases, an affirmative showing of an advisement and waiver rather than a silent record is necessary to establish that the confession of guilt is voluntarily made and that the defendant has knowingly and intelligently waived his rights. (*Id.*, at pp. 653-654 . . . .)"

■ It is unquestioned that *Bunnell* requirements are applicable where a defendant submits to court trial on the degree of a homicide pursuant to a stipulation precluding a first-degree murder conviction. (*People* v. *Gray* (1982) 135 Cal.App.3d 859, 868-869 [185 Cal.Rptr. 772].)[4] The People do not and cannot contend that defendant was expressly advised of and waived his right against self-incrimination in the course of submitting the case for court trial on the basis of police reports, defendant's two taped statements, and defendant's testimony. ■ Instead, the People contend that defendant invited the court's omission when defense counsel answered negatively the court's inquiry, "Would you say this is within the spirit of *Bunnell*?"

*People* v. *Gastile* (1988) 205 Cal.App.3d 1376, 1381 [253 Cal.Rptr. 283], explains: "In the area of criminal law, the doctrine of invited error is usually called upon in cases involving erroneous jury instruction. (See, e.g., *People* v. *Wickersham* (1982) 32 Cal.3d 307, 332 . . . ; [citations].) For the doctrine to apply, it must appear on the record that counsel acted for a tactical reason, rather than out of ignorance or mistake. (*People* v. *Wickersham*, *supra*, 32 Cal.3d at p. 330.)" In *Gastile*, the court found no tactical reason

---

[4]More precisely, the People do not question this proposition in response to defendant's appeal. They do, briefly, in response to defendant's habeas corpus petition. Authority is against their position.

for defense counsel to discourage the court from obtaining a jury trial waiver on a special circumstance allegation. (*Id.* at pp. 1381-1382.) We agree with defendant there appears to have been no tactical reason for defense counsel to distinguish *Bunnell*. Thus, defendant is not estopped from challenging on appeal the court's failure to obtain a waiver of the right against self-incrimination.

■ The People also contend that defendant implicitly waived this right when he testified at trial. *People* v. *Watson* (1985) 175 Cal.App.3d 1059 [221 Cal.Rptr. 672], cited by the People, is distinguishable. There, no admonitions or waivers except for waiver of jury trial were required when the defendant submitted his case for court trial. (*Id.* at pp. 1062-1063.) That submission to court trial occurred at the end of a jury trial after the prosecution had put on its witnesses, the defendant had cross-examined the prosecution witnesses, the prosecution had rested, the defense had presented its witnesses, including defendant, and the defense had rested. (*Id.* at p. 1062.) Thus, at the time of submission, "except for his right to jury trial, defendant had exercised and exhausted his remaining constitutional rights. In short, he had nothing left to waive." (*Id.* at p. 1063.) *Watson* was not the usual submission to court trial on hearsay evidence of transcripts or police reports. *Bunnell* requires express advisement and waiver of the right against self-incrimination when a case is thus submitted even where the defendant reserves the right to testify and later testifies. (*Wright, supra,* 43 Cal.3d 487, 493, 497-498.)

### C. *The impact of the error*

■ The ultimate question is whether the absence of advisement and waiver of defendant's right against self-incrimination is reversible error in this case. *Wright, supra,* 43 Cal.3d 487, held "that *Bunnell*'s requirement of a self-incrimination advisement and waiver is not constitutionally compelled for submissions that are not tantamount to a plea of guilty. If the submission does not amount to a slow plea of guilty, there is no involuntary confession of guilt. . . . A trial court's failure to comply with this judicial rule of criminal procedure requires reversal only if it is reasonably probable a result more favorable to the defendant would have been reached if he had been properly advised. [Fn. omitted.]" (*Id.* at p. 495.)

Defendant naturally contends that the submission in this case was tantamount to a plea of guilty and therefore reversible per se. (*Wright, supra,* 43 Cal.3d 487, 492.) An example of a slow plea of guilty despite a not guilty plea is when a defendant, usually in exchange for a promised sentence, submits to court trial based on a preliminary hearing transcript containing unchallenged prosecution evidence and the defendant does not argue its

sufficiency. It might not be a slow plea if the prosecution evidence is challenged by defense evidence or argument. (*Id.* at p. 496.) The entire proceeding should be considered to determine whether a submission is a slow plea. (*Ibid.*) "If it appears on the whole that the defendant advanced a substantial defense, the submission cannot be considered to be tantamount to a plea of guilty." (*Id.* at p. 497.)

Here, under the terms of the submission defendant admitted guilt of at most manslaughter. He did not admit guilt of second degree murder. He reserved the right to testify and did testify and his counsel vigorously argued provocation and heat of passion. Under these circumstances, defendant's hybrid submission was not tantamount to a plea of guilty to second degree murder, the crime of which he was ultimately convicted. *People* v. *Dakin* (1988) 200 Cal.App.3d 1026 [248 Cal.Rptr. 206] supports our conclusion. There, the defendant claimed he was prejudiced by lack of advice about his right against self-incrimination when he submitted a felony charge of driving with a blood-alcohol level of 0.10 percent or more and causing bodily injury based on the preliminary hearing transcript and other documentary evidence. While the court advised the defendant he would probably be found guilty (*id.* at pp. 1030, 1032), defendant argued that while he was guilty of a misdemeanor he was not guilty of the felony (*id.* at p. 1032). Although the defendant was convicted of the felony, the court did not regard the submission as tantamount to a guilty plea when defense counsel cross-examined witnesses at the preliminary hearing and in the superior court argued insufficiency of the evidence of bodily injury. (*Id.* at pp. 1032-1033.) The court found the appropriate test for prejudice to be whether the defendant probably would have obtained a better result had he been advised of the right against self-incrimination. (*Id.* at pp. 1033-1034.) This is also the appropriate test for prejudice here.

Defendant does not attempt to establish prejudice under this standard. In light of the prosecution evidence amassed in the police reports, defendant's chances of avoiding conviction for unlawfully killing a human being were remote. He faced potential exposure to first degree murder. Defendant's testimony about his mental state was important to resolving the remaining question of the nature of the crime. This is doubtless why the submission contemplated defendant's testimony. There is no suggestion defense counsel was ignorant of defendant's right against self-incrimination. It is extremely unlikely a judicial admonition about this right would have altered the defense strategy. In short, defendant was not prejudiced by the absence of express advice and waiver of his right against self-incrimination.[5] (Cf.

---

[5] We cannot tell if, while arguing that the lack of waiver was reversible per se, defendant intends to assert that the court also erred in failing to advise him of the certainty of conviction of at least manslaughter. If he does, this advice was not constitutionally required. (*People* v.

*Wright, supra,* 43 Cal.3d 487, 499; *Dakin, supra,* 200 Cal.App.3d 1026, 1034.)

As this is the only error we find on appeal, we reject defendant's final contention that he was prejudiced by a combination of errors.

4., 5.*

. . . . . . . . . . . . . . . . . . . . .

6. *Habeas corpus petition*

Defendant's habeas corpus petition alleges his trial counsel was unconstitutionally ineffective in failing to pursue the defense of unconsciousness and in misadvising him about how soon he could expect parole if convicted of second degree murder with personal use of a firearm. He also suggests the court thus misadvised him.

A. *Parole eligibility advice*

As described above (in part 3A), when defendant submitted to court trial, his counsel stated on the record that defendant would be eligible for parole if convicted of second degree murder with personal use of a firearm in seven years. The prosecutor agreed it would be seven or eight years, and the court advised defendant he would be eligible for parole in seven or eight years. ■ In support of his habeas corpus petition, defendant declared he was so advised and he would not have waived jury trial had he been correctly advised he would actually be in prison for at least 15 years, the low range for second degree murder. Defendant also submitted a declaration from defense counsel on other topics, but the declaration does not discuss what parole advice he provided.

■ Defendant correctly contends that prisoners serving indeterminate terms for first and second-degree murder convictions are not statutorily entitled to one-for-one work credits, but only one-for-two conduct credits. (*In re Oluwa* (1989) 207 Cal.App.3d 439, 444-447 [255 Cal.Rptr. 35]; *In re Monigold* (1988) 205 Cal.App.3d 1224, 1227 [253 Cal.Rptr. 120]; 70 Ops.Cal.Atty.Gen. 49 (1987).) The People do not contend otherwise.

---

*Smith* (1977) 70 Cal.App.3d 306, 314 [138 Cal.Rptr. 783].) If required by *Bunnell,* this omission was harmless for the same reasons the lack of self-incrimination advice was harmless.

 * See footnote, *ante,* page 1067.

The regulations of the Board of Prison Terms interpret Penal Code section 190 as providing for a 15-year minimum eligible parole date for a second degree murder committed after November 8, 1978. (Cal. Code Regs., tit. 15, §§ 2400, 2403, subd. (c).) If, as here, a court has imposed an enhancement for personal use of a firearm, the consecutive term is added to the minimum eligible parole date. (*Id.*, § 2406, subds. (a), (b).) A prisoner can earn postconviction credit against that parole date and reduce the period of confinement. (*Id.*, § 2411, subds. (a), (b).) Section 2410, subdivision (b), provides in part: "The suggested amount of postconviction credit is zero to 4 months for each year served since the date the life term started . . . . [¶] The board may grant more or less than 4 months annual postconviction credit when the prisoner's performance, participation or behavior warrants such adjustment of credit." More than four months credit may be awarded for exemplary conduct. (*Id.*, § 2410, subd. (b).)

██ Under these rules, a defendant convicted of second degree murder by personal use of a firearm would not ordinarily be eligible for parole before two-thirds of seventeen years, or eleven years, four months. Defendant was misadvised when he was told he would be eligible for parole in seven or eight years.

A case arising under the Indeterminate Sentencing Law posed the question, "Are the minimum time to be served and the minimum time for parole direct consequences of the plea?" (*People* v. *Johnson* (1977) 66 Cal.App.3d 197, 199 [135 Cal.Rptr. 756].) Unfortunately, that opinion does not answer the question. Instead it concluded the defendant was not prejudiced under the circumstances. That defendant was aware the maximum term was life imprisonment when he pled guilty to first degree murder. The court stated: "The maximum and minimum sentences for first degree murder are the same, life imprisonment." (*Id.* at p. 199.) Since the defendant appeared to accept the possibility of a life term, he could not have been prejudiced by not being informed that he might become eligible for parole in seven years. (*Id.* at p. 200.)

After posing the quoted question, *Johnson* discussed *People* v. *Tabucchi* (1976) 64 Cal.App.3d 133 [134 Cal.Rptr. 245]. That opinion concluded "a minimum term for parole eligibility must be deemed a direct rather than a collateral consequence of the guilty plea." (*Id.* at p. 143.) It is questionable whether *Tabucchi* intended to state a rule for all situations. That defendant was subject to a statutorily required minimum term before parole eligibility greater than the then well-known norm of one-third minimum time. (*Ibid.*) We interpret *Tabucchi* as requiring judicial advice about parole eligibility only where the usual eligibility rules are inapplicable. This was the case in *People* v. *Spears* (1984) 153 Cal.App.3d 79 [199 Cal.Rptr. 922], cited by

defendant, which held a defendant must be advised that probation is statutorily disfavored "when the plea and admissions make it so, *and* the defendant, counsel, and the court appear to consider probation 'likely.' " (*Id.* at p. 87; italics in original.)

In *In re Carabes* (1983) 144 Cal.App.3d 927 [193 Cal.Rptr. 65], as here, the defendant was advised before pleading guilty that his sentence would be 17 years to life for second degree murder by personal use of a firearm. He complained he "was not advised of the parole consequences of the plea." (*Id.* at p. 929.) The court took the position that his maximum term was life and his minimum was 17 years. (*Id.* at pp. 929-930.) The court concluded under the determinate sentencing law (Pen. Code, § 3000) "it is a direct and, pragmatically, an inexorable penal consequence of the plea that petitioner would be subject to a period of parole commencing sometime after he served his minimum term. The remote possibility that the parole board may permit an early release or waive parole does not detract from the real probability that a term of parole will be served. [Fn. omitted.]" (*Id.* at pp. 930-931.) Thus, defendants should be informed of the maximum parole period following incarceration.[13] (*Id.* at pp. 932-933; accord *Carter* v. *McCarthy* (9th Cir. 1986) 806 F.2d 1373, 1375-1376, cert. den. 484 U.S. 87 [98 L.Ed.2d 149, 108 P.2d 198].)

*Carabes* does not require additional judicial advice about the minimum term preceding parole eligibility. It does state that defendants should be advised "of the maximum and minimum prison terms that may be imposed upon conviction." (144 Cal.App.3d 927, 932-933.) This comment became a holding in *Dakin, supra,* 200 Cal.App.3d 1026, where error was found because the court failed to advise a defendant prior to a *Bunnell* submission of the minimum prison term available upon conviction. (*Id.* at p. 1033.)

We find no California precedent requiring judicial advice during a *Bunnell* submission of the usual minimum term before parole eligibility. The United States Supreme Court has indicated there is no federal constitutional requirement that the state "furnish a defendant with information about parole eligibility" prior to a guilty plea. (*Hill* v. *Lockhart* (1985) 474 U.S. 52, 56 [88 L.Ed.2d 203, 208, 106 P.2d 366]; accord *U.S.* v. *Sanclemente-Bejarano* (9th Cir. 1988) 861 F.2d 206, 208-209.) We do not regard the ordinary minimum term before parole eligibility to be a direct consequence of a conviction. As illustrated above, defendant's possible parole is dependent on the Board of Prison Term's evaluation of his conduct as a prisoner. Elaborate judicial advice about the prospects of parole and the effects of conduct and worktime credits is not required. (Cf. *Carabes, supra,* 144

---

[13] We observe defendant here was not so advised, but he makes no issue of this omission.

Cal.App.3d 927, 933.) We will not require trial courts to read the Board of Prison Term's parole eligibility regulations to defendants in anticipation of a guilty plea or a *Bunnell* submission.

The issue remains whether defense counsel misadvised defendant. In *People* v. *Soriano* (1987) 194 Cal.App.3d 1470 [240 Cal.Rptr. 328, 65 A.L.R.4th 705], defense counsel was found to have rendered ineffective assistance by not going beyond a general warning to her client that his guilty plea might have immigration consequences. (*Id.* at pp. 1478-1482.) "The commentary to the American Bar Association's Standards for Criminal Justice standard 14-3.2 notes that while 'the court must inquire into the defendant's understanding of the possible consequences at the time the plea is received . . . , this is not a substitute for advice by counsel. The court's warning, coming as it does just before the plea is taken, may not afford time for mature reflection.' (3 ABA Standards for Criminal Justice, std. 14-3.2 [2nd ed. 1980] at p. 74.)" (*Id.* at p. 1481.) Defense counsel should have advised the defendant after researching the issue that a conviction would render him deportable. (*Id.* at p. 1482.)

We cannot imagine a case where a defendant should not be informed by defense counsel not only about the probabilities of conviction of the charged offenses, but also about the likely amount of incarceration, if any, following conviction. Integral to this advice would be an estimate of the probable minimum term before parole eligibility. In a complicated case, the complexity of the sentencing law may excuse a defense counsel's inaccurate prediction. (*U.S.* v. *Turner* (9th Cir. 1989) 881 F.2d 684, 687.) We do not regard the present case as that complicated in terms of defendant's exposure to imprisonment if convicted of second degree murder with personal use of a firearm. From the record on appeal it appears that trial counsel misadvised defendant about the probable minimum prison term before parole. Defendant's declaration in support of his habeas corpus petition confirms this misadvice.

The People contend that defendant cannot demonstrate prejudice from this misadvice. Defendant has declared, however, that he would not have agreed to waive jury trial and submit the case as he did had he been advised that he risked over 11 years in prison if convicted of second degree murder with personal use of a firearm. We regard this as sufficient to establish "a prima facie case for relief on habeas corpus" (*In re Lawler* (1979) 23 Cal.3d 190, 194 [151 Cal.Rptr. 833, 588 P.2d 1257]) due to prejudice resulting from defense counsel's misadvice. (*Hill* v. *Lockhart* (8th Cir. 1990) 894 F.2d 1009, 1010; compare *In re Carabes, supra,* 144 Cal.App.3d 927, 933, with *Hill, supra,* 474 U.S. 52, 60 [88 L.Ed.2d 203, 211].)

B. *The possible defense of unconsciousness* *

. . . . . . . . . . . . . . . . . . . . . .

7. *Disposition*

We affirm the judgment of conviction.

The California Department of Corrections is ordered to show cause why Nam Van Huynh's petition for writ of habeas corpus should not be granted on the ground of misadvice by defense counsel concerning defendant's minimum term before parole eligibility. A formal written return shall be served and filed with the Santa Clara County Superior Court within one month of the issuance of the remittitur in this case. (See *In re Lawler, supra,* 23 Cal.3d 190, 194; *In re Sixto* (1989) 48 Cal.3d 1247, 1252 [259 Cal.Rptr. 491, 774 P.2d 164].) If it appears after any fact-finding deemed necessary by the superior court that defendant was incorrectly advised by defense counsel about parole eligibility following a second-degree murder conviction with personal use of a firearm and that a reasonable defendant would not have submitted the case to court trial as he did had he been properly advised (cf. *People* v. *Goodrum* (1991) 228 Cal.App.3d 397 [279 Cal.Rptr. 120]), then defendant will be entitled to withdraw from the terms of the submission.

Capaccioli, J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied May 20, 1991.

---

* See footnote, *ante,* page 1067.