Filed 5/14/14  P. v. Tapia Ca4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JOSE LUIS TAPIA,<br><br>  Defendant and Appellant. | G047788<br><br>(Super. Ct. No. 12CF1095)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found Jose Luis Tapia guilty of sexual battery, simple battery and false imprisonment by violence, and not guilty of burglary, assault with intent to commit rape and false imprisonment. The court placed defendant on three years of formal probation, one of the terms and conditions of which was serving 364 days in jail.

On appeal, defendant contends the court erred in limiting cross-examination of the victim, permitting the introduction of a statement made to police and that there was insufficient evidence to sustain his conviction for false imprisonment by violence. Finding no error, we affirm.

I

FACTS

M. V. lives in an apartment on Parton Street in Santa Ana. Defendant is the brother-in-law of the apartment manager.

On April 11, 2012 at about 2:15 in the afternoon, when she was three months pregnant, she was lying in bed with her infant daughter, who was sleeping, and her four-year-old son, who was watching television when she heard a noise. She then felt "like a shadow like standing like next to" her. Defendant was "standing like right next to [her] bed." She added she could smell alcohol and that he was "like drunk."

Defendant grabbed her breast, and said, "I can see your nipple." He chased her around the bed, and pulled the blanket away. She described what happened next: "And then he just grabbed me and he tried to grab my leg, and then he is like, are you wearing underwears? I was like, that's not none of your business." She took his hand away, and "then like he just got on top of [her], and that's when [her] daughter woke up and she started crying and shaking. Because she saw him on top of [her]. And [she] told him, get off, you're hurting me." He was "like hugging" her. She pushed defendant away. She started screaming for the apartment manager.

2

At some point, she threw his cell phone out of her bedroom and he walked toward it. She closed the door to her bedroom and "he grabbed the knife, like butter knife. And he tried to open [her] door again saying he wasn't able to find his phone outside." He tried to force open the bedroom door, and she locked it. He kept saying he couldn't find his phone, and she opened the bedroom door, and pointed outside her apartment so that he would look for his phone there. She said: "[H]e still had the knife in his hand saying give me my fricking phone. I want my phone." Once he was outside, she locked the door to the apartment and closed the window. V. called the police.

She described what happened next: "Well, he said he couldn't find the phone, that I still had it in my hand, and that I was going to steal it. That's when I told him why would I want your phone if I have my own cell phone? So he got mad and he started pulling the grass all over and throwing grass. And with the knife digging in the sand. And he got mad and he came and kicked my door and he was tapping on the window." Then he kicked open the door to her apartment.

V. told defendant she had called the police. He found his phone, got on his bike and "took off." She did not see what he did with the knife.

Santa Ana police officers found V. distraught, upset and crying. Police found the knife in a planter outside V.'s front door.

At approximately 4:00 that afternoon, police interviewed defendant. An officer described defendant's demeanor: "His speech was slow and deliberate. It was slurred. I had to repeat myself several times. And/or attempt to draw a decisive answer from the questioning. Because in my opinion, because of his inebriation."

Defendant admitted V.'s door was locked when he got there. Defendant reached through an open window and unlocked V.'s front door and let himself inside. He said he patted V., but he did not grab her, explaining: "I went over to visit her and I sat down and I talked to her, but I mean that was it. I didn't go in with the intentions

3

that I was going to like have any sex with her or nothing like that. All I wanted to do was just talk to her." He added that he did sit on the bed, and said, "because, like I said, I missed her and I wanted to be next to her so I kind of, I just gave her like a little hug, you know, like a friendly hug, you know."

## II

## DISCUSSION

*V.'s Tattoo*

During defense counsel's cross-examination of V. at trial, counsel asked: "You have a tattoo on the back side of your body?" and she responded "Yes, I do," just after the prosecutor objected on the basis of relevance. Defense counsel informed the court the relevance was to show defendant had firsthand knowledge of "an intimate part of her body." The court inquired exactly where the tattoo was, but defense counsel did not want to violate his client's confidentiality by telling the judge where it was. The court then offered to bring the witness back to chambers and inquire more about it, but defense counsel did not want to do that. The court sustained the objection.

Defendant's first contention on appeal is: "The trial court committed reversible error by barring cross-examination of the complaining witness regarding a tattoo on an intimate part of her body." He reasons that central to the defense theme was the discrediting V.'s testimony that she was never intimately involved with him.

On appeal, defendant provides two bases for the relevancy of V.'s tattoo: "(1) it would have provided independent, corroborative evidence of their sexual encounters and (2) it would have undermined Ms. V.'s credibility" since she denied the two had ever had a sexual relationship.

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) If the probative value of evidence is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a substantial

4

danger of undue prejudice, confusing the issues or misleading the jury, the court has the discretion to exclude relevant evidence. (Evid. Code, § 352.) A trial court's evidentiary ruling is reviewed for abuse of discretion. (*People v. Jablonski* (2006) 37 Cal.4th 774, 821.)

It is unknown where the tattoo is located on V.'s body. The court requested and attempted to glean more information but was unsuccessful. It could have been located on a part of the body easily visible to anyone, or visible to defendant when he pulled Valazquez's blanket away or chased her around the bed.

Under the circumstances we find in this record, we cannot conclude the court abused its discretion when it excluded evidence of the victim's tattoo. The proffered evidence had only marginal relevance, and was substantially outweighed by the risk of undue prejudice. Even if the court erred in excluding this evidence, which we do not find, we cannot conclude its admission would have made any difference in the jury's determination, and, in light of the overwhelming evidence to support the judgment, we do conclude it was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

*Defendant's Miranda Waiver*

Defendant next contends: "The court erred in admitting the police statement of [defendant] because any purported *Miranda* [*v. Arizona* (1966) 384 U.S. 436] waiver of [defendant's] Fifth Amendment rights was invalid."

At the beginning of the police interview of defendant on the day of the crimes, the following questions and answers were asked by a police officer and answered by defendant:

"[Q]: OK. Jose, before we get started, I'm going to read you your rights. I want to make sure you understand them. You ready?

"[A]: Yeah.

5

"[Q]:  OK.  Jose, you have the right to remain silent, do you understand?

"[A]:  Yes.

"[Q]:  Anything you say may be used against you in court, do you understand?

"[A]:  Yes.

"[Q]:  You have the right to an attorney before and during questioning, do you understand?

"[A]:  Yes.

"[Q]:  If you cannot afford an attorney, one will be appointed for you before questioning, do you understand?

"[A]:  Yes.

"[Q]:  Can we talk about what happened?

"[A]:  Yeah . . . ."

When the prosecutor requested the court's permission to play a recording of the police interview of defendant, defense counsel objected, and stated at the sidebar:  "The officer just testified that he was so inebriated he was not able to answer questions, so then can he give a *Miranda* waiver at that point?  Does he have — did he have enough capacity to waive his *Miranda* rights?  If he could not answer questions according to this officer's testimony, could he have given a *Miranda*?"  At that point, the court excused the jury and listened to the testimony.  The court then heard from counsel and ruled:  "In respect to the defendant's demeanor on the tape, he speaks clearly.  He is calm.  He is apparently articulate.  He is animated, especially at the point of the cell phone and it being a gift.  I don't see impairment there.  I mean, okay, he has been drinking. . . .  I don't see that there's an issue about his ability to waive *Miranda*."  The court concluded:  "The motion to suppress the statement under inability to knowingly, intelligently waive the rights, is denied."

6

In *Miranda v. Arizona*, *supra*, 384 U.S. 436, the Supreme Court stated that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." (*Id.* at p. 458.)

On appeal, we defer to the trial court's factual findings which are supported by substantial evidence and independently determine whether the statement was obtained in violation of *Miranda.* (*People v. Nelson* (2012) 53 Cal.4th 367, 380.)

"Just as 'The mere fact of ministration of drugs does not establish an impairment of capacity so as to render a confession inadmissible' [citations] so too the mere fact of voluntary consumption of alcohol fails to establish such an impairment." (*People v. Hendricks* (1987) 43 Cal.3d 584, 591.)

We have both listened to the audio and read the transcript of the police interrogation of defendant. We conclude defendant comprehended all the information the police were required to convey when defendant's *Miranda* rights were conveyed to him, that defendant understood everything being said and that he intelligently and voluntarily waived those rights. Throughout the entire interrogation as well, defendant provided appropriate responses to police inquiries, showing no difficulty in understanding all the questions posed to him. Nothing we heard or read in the interrogation indicates defendant lacked the capacity to completely appreciate and grasp his circumstances.

*False Imprisonment*

According to defendant: "There was insufficient evidence to convict [him] of false imprisonment because [he] neither restrained the complaining witness from leaving her apartment nor used violence or menace." He says swearing, touching or being loud and obnoxious "does not imprisonment make." He further

7

argues:  "There is no evidence that [he] ever blocked or impeded Ms. V.'s ability to leave her bedroom."

In assessing an insufficiency of the evidence claim, a reviewing court must review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence which is reasonable, credible and of solid value "such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

"False imprisonment is the unlawful violation of the personal liberty of another."  (Pen. Code, § 236.)  "If the false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170."  (Pen. Code, § 237, subd. (a).)  Felony false imprisonment is "'effected by violence, menace, fraud, or deceit.'"  (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1490.)  "'Menace' is defined as ""'a threat of harm express or implied by word or act.'""  [Citation.]"  (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.)

Apparently defendant expects to convince this court that a screaming pregnant woman was not blocked or impeded, while having an infant and another small child to protect, when he unexpectedly appeared above her bed, felt her breasts, threw himself on top of her, chased her, made sexual comments, and after she used a ruse to get him out of her bedroom he then used a knife to try to force his way back in through her only exit.  Under the circumstances we find in this record, we must conclude there is substantial evidence defendant used both violence and menace when he violated V.'s personal liberty.

8

## III

## DISPOSITION

Because we find the trial court did not err in its evidentiary rulings, we need not address defendant's contention the cumulative effect of the court's evidentiary errors denied him due process. (*People v. Edwards* (2013) 57 Cal.4th 658, 704-705.) The judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.