Filed 6/8/15  P. v. Brady CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CALEB ANDREW BRADY,<br><br>Defendant and Appellant. | F068303<br><br>(Kings Super. Ct. No. 12CM4243)<br><br>**OPINION** |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Kings County.  Donna Tartar, Judge.

Deborah Prucha, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

* Before Kane, Acting P.J., Poochigian, J. and Franson, J.

## INTRODUCTION

Appellant/defendant Caleb Andrew Brady pleaded guilty to assault with a deadly weapon, admitted a gang enhancement, and was sentenced to the stipulated term of nine years pursuant to a negotiated disposition. On appeal, his appellate counsel filed a brief that summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) By letter on April 2, 2014, we invited defendant to submit additional briefing.

Defendant has filed a letter brief and raises several issues: He was intoxicated when he confessed to the crime; the court improperly denied his motion to discharge his appointed counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); and the court and his attorney forced him to plead guilty. We will address these contentions and affirm.

## FACTS

On September 12, 2012, Officer Mark Carrillo responded to Grant Street in Hanford and found Juan Munoz lying in a significant amount of blood. Munoz had been stabbed under his left arm, about eight inches below his armpit. The laceration was about half an inch long, and it was actively bleeding. Munoz was taken to the hospital, and Carrillo did not interview him at the scene.

Officer Carrillo later spoke to Munoz in the hospital's emergency room. Munoz said he had been walking home from a store when he was accosted by four men on Davis Street near Roosevelt School. One man yelled, "[N]orte," while another called him a "scrapa" and "scrap," which were derogatory words for a rival gang. One man asked where he was from, to which Munoz replied that he was not in the rival gang, and he was just "a piza," which meant a field worker without gang affiliation.

Munoz said one man hit him in the face and knocked him down. He recognized this man as someone who lived on Davis Street and was known as "El Grandote," which meant "the big guy."

Munoz said he got up and ran away, but the four men chased him. One man grabbed Munoz and threw him against a parked car. Munoz fell down, and the men punched and kicked him.

Munoz said he got up and again tried to run away. However, one man produced a pocket knife with an approximate four-inch blade and stabbed Munoz in the side. Munoz said this man was a 19-year-old Hispanic male. Munoz said "El Grandote" was not the man who stabbed him. Munoz staggered away, and he was found about a quarter-block from Roosevelt School.

After he interviewed Munoz, Officer Carrillo returned to the scene and spoke to Alvin Smith and Adam Guerrero, who were in the area. Smith matched Munoz's description of one of the men who attacked him.

**The Investigation**

On September 13, 2012, Officer John Bidegaray interviewed Munoz, who said he recognized one of the subjects as someone who lived in a particular house on Davis Street, and described the house. Bidegaray drove Munoz to the area, and he pointed out the house. Bidegaray testified Adam Guerra lived in the house.

Officer Bidegaray showed several photographic lineups to Munoz. Munoz identified Guerra as one of the assailants, and said Guerra yelled gang slurs at him prior to the attack and started the fight. Munoz also identified Alvin Smith as one of the suspects.

Officer Bidegaray contacted Guerra and asked him about the incident. Guerra said he was in his house with Alvin Smith, and he did not know what happened.

Officer Bidegaray spoke to Smith, who said he was outside with Guerra when the fight started, but they had nothing to do with it. Smith also said that Guerra might have yelled out a few gang slurs and thrown a punch.

On November 23, 2012, Officer Bidegaray again interviewed Guerra. Guerra said defendant attacked the victim.

On November 24, 2012, Officer Bidegaray called defendant and asked to meet with him at the police department. Defendant agreed but he never showed up.

**Defendant's Confession**

On November 29, 2012, defendant's mother called the police department and reported him as a runaway. She indicated he was somewhere by the Silverado Apartments and provided his cell phone number.

Officer Carrillo called defendant's cell phone and spoke to him. Defendant said he would meet Carrillo at a store. During the conversation, defendant "made mention of a stabbing and wanted to turn himself in for something. And how the police were always arresting the wrong people." Carrillo testified defendant volunteered these statements, and Carrillo never mentioned or asked defendant anything about a stabbing.

Officer Carrillo drove to the meeting place, but defendant did not show up. Carrillo called him back, and defendant said they could meet at a liquor store on 11th and Davis. Carrillo drove to that location, and defendant was there. Carrillo testified defendant showed symptoms of being under the influence because his eyes were red and watery, there was a slight slur to his speech, and an odor of an alcoholic beverage.

Officer Carrillo did not bring up the stabbing or provide any details. Defendant spontaneously said he was involved in a stabbing, that he had "done it," and he had stabbed a "little" Mexican male down the street by Roosevelt School. Defendant said he believed the victim was "a scrap." The victim was "wearing blue on his block," and defendant stabbed him with a knife.[1] Defendant said after he stabbed the victim, the man ran away, and defendant "walked away and had a nice day."

---

[1] Officer Carrillo believed the victim was wearing a white shirt. The police later determined Munoz identified himself as a Sureño "dropout."

4.

Officer Carrillo asked defendant on what side he stabbed the victim. Defendant said, " 'I don't know. Left side, right side.' " Defendant motioned to his upper left back area.[2]

Defendant mentioned "Adam G." and Alvin Smith, and said they had nothing to do with it. Defendant said he was by himself, and he had done it alone. Officer Carrillo told defendant that a man named "Alvin" had been arrested, and he had already pleaded guilty to the charge. Defendant became upset. Defendant said that Alvin had tried to pull him off while it was going on. Carrillo reminded defendant that he said he had been by himself. Defendant did not respond.

Defendant was taken into custody. Later that day, Officer Bidegaray advised defendant of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and defendant agreed to answer questions. Defendant said he "did the stabbing – the one Adam G. … got charged for." Defendant said he stabbed the victim because he was "a scrap." Defendant said he was a northerner and belonged to the South Side Loc, which was a northern subset. Defendant committed the stabbing because he was "putting work in."

Defendant said he had been "chilling" by the apartments near Roosevelt School and saw the victim walking by. He had a verbal altercation with the victim, the victim tried to run away, and defendant chased and stabbed him in the back. Defendant said he recognized the victim because he had previously seen him in the neighborhood.[3]

When defendant was processed in juvenile hall, he told the staff that he was a northerner and a South Side Loc.

---

[2] The victim was stabbed eight inches below the left armpit.

[3] Munoz was never shown a photographic lineup with defendant's picture. He identified Luis Ortega from a photographic lineup and thought he was the man who stabbed him; Ortega was not charged in this case.

**Procedural History**

On June 28, 2013, an information was filed in the Superior Court of Kings County charging defendant with count I, attempted murder (Pen. Code, §§ 664/187, subd. (a));[4] count II, assault with a deadly weapon (§ 245, subd. (a)(1)); and count III, active participation in a criminal street gang (§ 186.22, subd. (a)). It was alleged the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (d)); defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)); and he was 16 years old and committed offenses within the meaning of Welfare and Institutions Code section 707, subdivision (d).

**Defendant's *Marsden* Motion**

On July 25, 2013, defendant appeared in court with his appointed counsel and made a *Marsden* motion. At the *Marsden* hearing, defendant complained that his appointed counsel had not investigated the case or talked to him about the upcoming trial. Defendant believed his attorney did not want to defend him. The court asked defendant to explain. Defendant said he had heard of other cases where people committed more serious assaults and received plea deals for less serious charges. Defendant asked the court if it could arrange for the prosecutor to drop the attempted murder charge since the victim was only stabbed in the arm and got out of the hospital the next day. Defendant said he was scared because he was facing a possible life term for attempted murder.

The court asked defense counsel if there was a pending offer from the prosecution. Counsel replied there were two offers which involved a plea to a violation of section 245, with gang and great bodily injury enhancements, and with possible 50 percent conduct credits. The court advised defendant that the pending offer was what he wanted. Defendant told the court he would take the deal, if he pleaded to something other than a

---

[4] All further statutory references are to the Penal Code unless otherwise indicated.

6.

strike. The court replied that it did not engage in negotiations, and he should talk to his attorney about the prosecution's offers.

The court asked defense counsel if he had gone over the police report with defendant and advised him of the charges and possible sentence. Counsel said yes, but that defendant did not want to talk to him about the plea offers.

The court denied defendant's *Marsden* motion and advised him to talk to defense counsel about the plea offers.

After the court denied the *Marsden* motion, it reconvened the pretrial conference, and the prosecutor indicated it was the last day for defendant to consider the plea offer. The court asked defense counsel to give defendant a copy of the police report, and for the prosecutor to state the specific terms of the two plea offers. After the prosecutor stated the terms, the court advised defendant about his maximum possible exposure and explained the pending plea offers. The court continued the matter an additional day to give defendant more time to consider the offers.

**Plea and Sentence**

On July 26, 2013, the court reconvened and defendant asked about his potential custody credits. The prosecutor said he was eligible to earn 50 percent. Defendant indicated he would accept the plea offer. The court extensively reviewed the charges and the potential consequences of a plea, including whether the offenses were strikes. Defendant said he understood and would enter the plea. The court asked defendant if he had sufficient time to discuss the plea with his attorney, and defendant said yes.

The information was amended to allege the gang enhancement was pursuant to section 186.22, subdivision (b)(1). Thereafter, defendant pleaded no contest to count II, assault with a deadly weapon, and admitted the gang enhancement; no contest to count III, active participation in a criminal street gang; and admitted the Welfare and

Institutions Code section 707, subdivision (d)(1) allegation, pursuant to a stipulated term of nine years. The court dismissed the remaining charges.[5]

On September 3, 2013, the court sentenced defendant to the upper term of four years for count II, plus a consecutive term of five years for the gang enhancement; and a concurrent term of two years for count III. The court ordered defendant housed at the Division of Juvenile Justice until his 18th birthday.

On October 29, 2013, defendant filed a notice of appeal.

On November 1, 2013, the court granted defendant's request for a certificate of probable cause.

## DISCUSSION

As noted above, defendant's counsel has filed a *Wende* brief with this court. In response to this court's notice, defendant filed a letter with this court and raises the following issues.

### A. Validity of Defendant's Confession

Defendant contends that he falsely confessed to the stabbing because he was drunk. "Just as 'The mere fact of ministration of drugs does not establish an impairment of capacity so as to render a confession inadmissible' [citations], so too the mere fact of voluntary consumption of alcohol fails to establish such an impairment." (*People v. Hendricks* (1987) 43 Cal.3d 584, 591.) Officer Carrillo testified that when he met defendant, he showed symptoms of being under the influence because his eyes were red and watery, there was a slight slur to his speech, and there was an odor of an alcoholic beverage. However, defendant provided details about the stabbing and the names of the other two suspects, and he answered Carrillo's questions. Carrillo never testified that defendant was impaired in any way or did not understand what he was saying.

---

[5] At the plea hearing, the prosecutor stated the coparticipants in the case were members of the same gang subject in Hanford.

Defendant was later interviewed by Officer Bidegaray, who did not describe defendant as appearing intoxicated or impaired. Instead, defendant again confessed that he stabbed the victim and provided details about the incident. There is no evidence in this record that defendant's multiple confessions were involuntary or the result of any purported intoxication.

## B. Denial of *Marsden* motion

Defendant apparently challenges the denial of his *Marsden* motion. Defendant complains that he tried to fire his attorney because he never talked to defendant about the case, that he was never in court, that counsel always sent a "substitute," and that he never looked at his case or investigated evidence to prove defendant's innocence. Defendant asserts the court denied his *Marsden* motion simply because counsel "showed up" for the *Marsden* hearing.

"A trial court should grant a defendant's *Marsden* motion only when the defendant has made 'a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation [citation],…' " (*People v. Hines* (1997) 15 Cal.4th 997, 1025.) "However …, 'the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence.' [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 230.)

The court properly denied defendant's *Marsden* motion. As set forth *ante*, defendant's primary complaint at the *Marsden* hearing was that he should receive a plea offer for a lesser sentence, and he asked the court to intervene to arrange such an outcome. Defense counsel explained there were two pending plea offers but defendant had refused to talk to him about it. The court advised defendant to talk to his attorney.

After the court denied his *Marsden* motion, it ordered the prosecutor to state the specific terms of the two plea offers, discussed these offers with defendant, and continued the matter an additional day past the prosecution's stated time period to accept or reject the offers. The following day, defendant asked the court questions about his potential

9.

credits under the plea offers, and the court and the prosecutor responded to these questions. Defendant then decided to accept one of the offers and entered into his pleas and admissions. He was advised and waived his constitutional rights, said he had sufficient time to discuss the matter with his attorney, and he did not have any questions.

### C. Validity of Defendant's Plea

Defendant contends that after the court denied his *Marsden* motion, he was scared to go to trial with his appointed counsel because he believed the attorney would not defend him, and he was afraid he would be convicted and go to prison for a long time. Defendant claims the court and his attorney pressured him to take the plea; he was intimidated; he did not understand his rights; and defense counsel falsely stated defendant had never been threatened or forced to plead guilty.

These assertions are refuted by the record. As we have already explained, defendant's primary complaint at the *Marsden* hearing was about a possible plea bargain, and the court ensured defendant understood the pending offers and had time to consider them. There is no evidence that the court, defense counsel, or anyone threatened or intimidated defendant into accepting the plea offer.

After further independent review of the record, we find that no reasonably arguable factual or legal issues exist.

### DISPOSITION

The judgment is affirmed.